In the Matter of the NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.

No. 30226.

United States District Court
D. Connecticut.

May 28, 1969.

---

Elliot L. Richardson, Atty. Gen., for the Commonwealth of Massachusetts.

Wilkie Bushby, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Chase Manhattan Bank.

Simpson, Thacher & Bartlett, New York City, for Manufacturers Hanover Trust Co.

Lester C. Migdal, Migdal, Low, Tenney & Glass, New York City, and Lander, Greenfield & Krick, New Haven, Conn., for Bondholders' Committee.

Dennis N. Garvey, New Haven, Conn., Mulholland, Robie & Hickey, Washington, D. C., for Railway Labor Executives' Assn.

Louis J. Lefkowitz, Atty. Gen., Albany, N. Y., for the State of New York.

Hellerstein, Rosier & Rembar, Myron S. Isaacs, New York City, for Oscar Gruss & Son.

Robert M. Schacht, Providence, R. I., for the State of Rhode Island.

Harold Meyerson, Hale, Grant, Meyerson & O'Brien, New York City, for Providence & Worcester Railroad Co.

Paul A. Sweeney, Special Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for the United States.

Walter A. Kernan, Carter, Ledyard & Milburn, New York City, for United States Trust Co. of New York.

Robert K. Killian, Atty. Gen., Samuel Kanell, Special Asst. Atty. Gen., Hartford, Conn., for the State of Connecticut.

Leonard S. Goodmann, Asst. Gen. Counsel, Robert W. Ginnane, Gen. Counsel, Jerome E. Sharfman, Washington, D. C., for Interstate Commerce Commission.

Granville Whittlesey, Jr., Carl E. Newton, Donovan, Leisure, Newton & Irvine, New York City, for Trustee, Per Diem matters.

James Garfield, Choate, Hall & Stewart, Boston, Mass., for Trustee in Boston & Providence matters.

James W. Moore, Robert W. Blanchette, New Haven, Conn., Joseph Auerbach, John N. Worcester, Sullivan & Worcester, Boston, Mass., for Richard Joyce Smith and William J. Kirk.

Roswell P. Perkins, Debevoise, Plimpton, Lyons & Gates, Ulrich Schweitzer, Gen. Corp. Counsel, New York City, Windsor F. Cousins, Richard R. Bongartz, Edwin K. Taylor, Philadelphia, Pa., for Pennsylvania New York Central Transportation Co.

Robert M. Morgenthau, U. S. Atty., David Paget, Asst. U. S. Atty., New York City.

Stephen A. Weiner, Winthrop, Stimson, Putnam & Roberts, New York City, for Irving Trust Co.

MEMORANDUM OF DECISION ON THE ISSUE OF THE PRICE TO BE PAID FOR THE DEBTOR'S ASSETS

ANDERSON, Circuit Judge (sitting by designation).

In 1968 both this, the Reorganization Court, and a statutory Three Judge District Court in the Southern District of New York reviewed the Second and Third (primarily the Second) Supplemental Reports of the Interstate Commerce Commission, 331 I.C.C. 643, 754, this court pursuant to § 77(e) of the Bankruptcy Act, 11 U.S.C. § 205(e), and the Three Judge Court pursuant to 28 U.S.C. §§ 1336(a), 2321–2325 applying § 5(2) (b & d) of the Interstate Commerce Act (49 U.S.C. § 5(2) (b & d)). By its decision of May 6, 1968 [1] the Three Judge Court remanded the case to the I.C.C. for the correction of certain errors and for the reconsideration of the amount to be paid by Penn Central for the assets of the New Haven.

On August 13, 1968 the Reorganization Court filed its decision of August 13th,[2] which likewise remanded the case to the I.C.C. for substantially the same reasons. This court, however, held that because of the desperate financial condition of the New Haven Railroad, its rate of operational losses, outflow of cash, and the steady irreversible erosion of its estate, a continuance of railroad operations beyond December 31, 1968 would constitute such a taking of the New Haven Railroad's property without just compensation that it would be constitutionally impermissible. It further made clear that unless the transfer of the assets of the New Haven and the operation of the transportation system were taken over by the Penn Central by January 1, 1969, the trains of the New Haven would stop running.

The I.C.C. on remand held further hearings on the issues presented and, on November 25, 1968 (service date December 2, 1968), issued its Fourth Supplemental Report and Order, 334 I.C.C. 25. This not only covered its redetermination of the price to be paid by the Penn Central for the assets of the New Haven, but also the plan for the reorganized New Haven Railroad (hereinafter referred to as "Step Two"), including the method and means of distribution to various classes of creditors. The I.C.C. certified the whole plan to this court; after due notice, certain of the parties in interest filed objections

1. New York, New Haven & Hartford Railroad Co., Bondholders' Committee v. United States, D.C., 289 F.Supp. 418.

2. D.C. 289 F.Supp. 451.

and briefs; and a hearing was held before this court on December 20, 1968 limited to that part of the Fourth Supplemental Report and Order which was crucial to the life of the New Haven.

This was the requirement that Penn Central take over the New Haven by January 1, 1969; that New Haven make a binding transfer, free and clear of all liens, to Penn Central of its assets that were to be transferred under the agreement, as amended, between Pennsylvania, New York Central and the Trustees of the New Haven; and that Penn Central concurrently pay to the Trustees of the New Haven the consideration which the Commission in its Report found to be fair and equitable.

On December 24, 1968 this court by its Order No. 559 and accompanying Memorandum of Decision approved and ordered the foregoing, without prejudice to the right of any party to contest the fairness and adequacy of the consideration.

Penn Central sought a stay of the inclusion portion of the order, both in the Three Judge Court and this court, but its petitions were denied and the transfer and payment of consideration took place as directed on December 31, 1968 —seven and one-half years after New Haven went into reorganization.

Subsequently, the fairness and adequacy of the consideration and the "Step Two" provisions of the plan came on for hearing and argument on March 31, April 1 and 2, 1969.

This opinion deals solely with the consideration, as fixed by the Commission, in its Fourth Supplemental Report and Order of November 25, 1968, *supra*.

In that Report and Order the Commission found the liquidation value of the assets to be transferred by the New Haven to Penn Central was, as of December 31, 1966, $162.7 million. It then deducted $22.1 million to make allowance for two factors: one, a reduction of $15,386,000 in the value of the estate for a 1-year delay before the start of liquidation could commence, which the Commission said would be necessary before it would issue an abandonment certificate;[3] and, two, a bulk sale discount of $6,695,000. These items will be discussed presently, but first something should be said about liquidation value as the basis for determining price.

From the time the Trustees filed their plan with the Commission on October 27, 1966, the parties, the Commission and the courts have used the term liquidation value as an economic term to describe the best price that the existing market could fairly be expected to provide for the sale of the assets of the New Haven Railroad over a reasonable period of time, fixed by the Commission at six years. It was expected that from this gross amount the economic costs and expenses incident thereto would be subtracted to arrive at a fair liquidation value. These were such items as expenses of holding and maintaining the property during the six year period, taxes, counsel fees, costs of sale, bro-

---

3. The Commission makes reference to this court's opinion of August 13, 1968 as support for the correctness of its deduction from fair liquidation value for losses pending abandonment proceedings. This court said, 289 F.Supp. at 459, "While liquidation will have to await authority to abandon, the trains will stop in January because * * * actual operation of the Railroad will cease." This was, however, in the event that the Commission did *not* order inclusion by January 1, 1969. Even if this had happened, it was not contemplated by this court that abandonment proceedings would take more than four to six weeks. The New Haven had

been studied, examined and reported on almost continuously since 1957. For the seven and a half years of the reorganization the states, municipalities and the federal government had been heard over and over again. Nothing more than pro forma abandonment proceedings were called for.

It is of interest to note that the application for abandonment in the case of the Tennessee Central Railway Company, Finance Docket #24964, 333 I.C.C. 443, was filed February 12, 1968 and the certificate and order permitting abandonment was issued April 25, 1968.

kerage commissions, appraisal fees, other similar expenses and discounts for delay in receipt of proceeds; and a discount of $8 million for contingencies such as failure to sell some items and for other risks which could result from a disposal of all the assets in the six year period. No one of the parties through the inclusion hearings, nor the Commission in its Report of November 16, 1967, 331 I.C.C. 643, took the position that circumstances attending hypothetical liquidation proceedings, such as delays in commencing those proceedings that would be occasioned by a petition for and termination of the § 77 Reorganization, the subsequent accounting, setting up a liquidating equity receivership, and hearing on foreclosure of the mortgages, as well as time consumed in abandonment proceedings before the I.C.C., were factors to be considered in determining fair liquidation value. In its inclusion report the Commission spoke of the evidence received as having been "directed largely toward showing asset values upon an *assumed liquidation.*" (Emphasis supplied.) 331 I.C.C. 643, 657.

■ The assumption included a situation where the Railroad's operations had been lawfully abandoned and its properties were being dismantled and sold piecemeal. The Commission considered this as purely hypothetical and unlikely to occur, but in its inclusion Report of 1967, 331 I.C.C. 643, 704, it had in mind that actual liquidation would involve lengthy legal proceedings which could well burden the creditors with further operating losses. On the same page it said, "We have found herein the fair liquidation value of the NH properties and that the consideration to be paid by Penn-Central is worth at least that value", but it made no effort to reduce the fair liquidation value by any such means as it employed in its Fourth Supplemental Report of 1968. In the circumstances of this case, the proper method for determining fair liquidation value was that utilized by the Commission in 1967, although it incorrectly applied the method in some respects.

■ The Commission in its inclusion report gave recognition to § 77(b) (5) which proscribes sales of a debtor's property for less than "a fair upset price." It found that the liquidation value of New Haven's property exceeded the fair upset price. It did not attempt to distinguish between the two measures of value or separately to define them. This court in its opinion of August 13, 1968 (289 F.Supp. at 455), discussed the history of the term,[4] and concluded that under the circumstances of the present case and as applied to it, fair upset value means the same thing as "fair market" or "liquidation value." But in its Fourth Supplemental Report the Commission found the liquidation value to be $162.7 million, then ordered the sale of the debtor's property for $22.1 million less. This court concludes that the Commission's order in thus reducing the predetermined liquidation value, illegally contravened the statute.

■ Both reviewing courts decided that under the circumstances of this case the only feasible standard for determining price must, because of both the "fair and equitable" clauses of the

---

4. At the end of the discussion of fair upset price this court noted there was some authority that it may be less than "fair market" or "liquidation" value at least where the purchaser is a public authority, according to a 1911 decision of a federal court in New Hampshire, cited in the margin. It was referred to as a matter of historic interest and not as in any way applicable to the present case, which concerns purchase by a private corporation. In view of the Commission's assertions of power in its Fourth Supplemental Report to order a sale, in the name of the public interest, to a purchaser who agrees to operate the railroad, for a price less than the fair liquidation or fair salvage value, it becomes necessary for this court to note its disagreement with the Commission's claim and with the 1911 New Hampshire case to the extent it may lend support to the Commission in this regard, because of the constitutional infirmity of the position in authorizing a sale for something less than just compensation.

statutes and the constitutional mandate, be the fair liquidation value, which is the property's highest and best use. On the remand the Three Judge Court (289 F.Supp. at 441), concurred in by this court (289 F.Supp. at 454), directed the Commission as follows:

"The Commission is therefore directed to make detailed findings as to each element of liquidation value and of the consideration to be paid by Penn Central on a basis consistent with this opinion. If it agrees with our view that the price cannot be less than the liquidation value, it shall prescribe suitable terms. If it does not, it shall state the pricing theory it has adopted, the reasons for it, and the results, and shall make whatever detailed subsidiary findings are required to support this." [Footnote omitted.]

The Commission's Fourth Supplemental Report and its counsel's express admission in oral argument before this court have made clear that the Commission neither developed nor applied a new or different pricing theory; but purported to base its determination on fair liquidation value. Its newly conceived deductions for delay in issuing an abandonment certificate and for a bulk sale discount are described by the Commission as "refinements" of the fair liquidation value theory. It also disputed the courts' interpretation of the constitutional mandate and adopted one of its own. This appears to be that the use of the pricing theory based upon fair liquidation value wholly derives from, and is completely subject to, the issuance of an abandonment certificate by the Commission, which it will not issue to a debtor, as a matter of right, though the debtor has for many years been submerged in a deficit operation with no prospect of improvement;[5] but may grant as a privilege in its sole discretion,

to be given or withheld on the conclusory basis that its action is "fair and equitable" or "required by the public interest", and apparently unsupported by anything more substantial than the Commission's own introspections or the latest word from the Cumean Sybil.

The Commission also asserts that, because the Constitution does not specify any particular method of valuation, it possesses unrestricted flexibility and range of discretion; and "due process" and "just compensation" referred to in the Fifth Amendment mean compensation based upon the value of the assets remaining after the debtor's estate has been invaded to the unlimited extent the Commission finds is called for by the paramount public interest, provided the Commission takes pains to declare it fair and equitable. This is tantamount to no constitutional protection whatever.

In this court's opinion of August 13, 1968, (289 F.Supp. at 455), it described the extent to which the bondholders' constitutional rights could be invaded in the case of a railroad in bankruptcy as follows:

"Both the Commission and the courts, however, have reiterated in this and in related proceedings that as bondholders of a railroad their interests are subject to such invasion as may be essential to continue the operation of the railroad for a reasonable period of time to provide an opportunity to work out a permanent plan or means of continuing the operation, if possible, to the extent that it is required by the public interest." [Footnote omitted.]

The Three Judge Court described the extra burden imposed upon the creditors of a railroad at this stage of a reorganization as follows:

"Although we agree that by investing in a railroad the bondholders did not

---

5. Inclusion Report of I.C.C., dated November 16, 1967, 331 I.C.C. at 687: "If there is one thing on this record that is clear and undeniable, it is that NH has neither earning power nor the prospect of earning power."

331 I.C.C. at 697: "The cold, hard fact is that NH has been losing money for years and that unfortunate situation continues unarrested."

surrender their constitutional right not to be required to operate the property at a perpetual loss, they did subject themselves to such interim losses as are reasonably incident to working out the solution most consistent with the public interest." 289 F.Supp. 418, at 444.

By late 1963 it was clear to the Trustees of the New Haven and to the Reorganization Court that only two courses were open: the Trustees must press to accomplish the inclusion in a Penn Central merger or they must press for liquidation. The former was obviously in the public interest and the latter was not. The course of inclusion was followed; but because the merger and the reorganization proceedings stretched out far beyond what was originally forecast, the "interim" became seven and a half years; and "losses reasonably incident to working out the solution most consistent with the public interest" eroded the debtor's estate in excess of $60 million.[6]

In addition to increasing the burden of these losses, the Commission asserts the power to hold up liquidation of a railroad, long operating deeply in the red, not only for a reasonable time to provide an opportunity to work out a permanent plan or means of continuing operations, but for as long a period or periods as the Commission finds there is "a hope of a public takeover of segments" to provide states and communities an opportunity to present their plans.

Like Laban of old, the Commission would now require further servitude of the debtor—in this case the creditors. But the duty of the debtor's creditors to suffer losses for an interim period has already been fulfilled and the public interest has already been served to the extent that in fairness and equity the public had any right to demand. This proposition is clear beyond doubt. The public interest may well have been over protected. There was certainly no under protection. The solution most consistent with the public interest has been worked out and the I.C.C. has no power or right to require more.

Putting to one side, momentarily, the constitutional bar to the imposition of further losses on the New Haven, something should be said regarding the gross unfairness and inequity of imposing such losses in the name of the public interest. During seven and one-half years, the Federal government, the states, the communities and the public in general were fully informed by the Trustees of the Railroad as to the inability of the New Haven to survive as an independent railroad. And, apart from seeking inclusion in a merged Penn Central, the Trustees were engaging in a holding operation to afford the public bodies, as the real guardians of the public interest, the opportunity to act—to take over or adopt measures to preserve the New Haven transportation system. Response to this was partial tax assistance and, in the latter half of the period, grants which covered about ⅓ of the annual passenger losses. New York and Connecticut, acting through Tri-State Transportation Commission and with Federal aid, contemplate contracting for the purchase of railroad passenger transportation for the west-end commuter service in and out of New York—a project which is still going forward and is now being worked out with the Penn Central. Similarly, a contract was made by the Massachusetts Bay Transportation Authority for commuter service in the greater Boston area. Otherwise nothing has come to the attention of this court, to indicate anything more than a highly speculative prospect, that any or all of the states concerned or their municipalities had the slightest interest in taking over and operating the New Haven or any segment of it.

In spite of full awareness of the situation of the bankrupt line and with nothing to prevent their doing so, no

---

6. See 334 I.C.C. at 126, Appendix 4, Classification of Claims: A, B, D, E, F, totalling $63,-868,000.

standby legislation, for use if inclusion of the New Haven by Penn Central fell through, was ever enacted or sought to be passed in seven and one-half years by the Federal Government or by any of the states for the take over and operation of the New Haven freight and passenger system or a segment of it (except for the west-end and the Boston commuter services); nor was any plan ever filed by the governmental bodies incorporating such take over and operation. If inclusion by the Penn Central had not been achieved and no such standby legislation had been passed, the cost of the failure of the governmental bodies to act must, according to the Commission, be chargeable to the New Haven estate to afford the governmental bodies an additional opportunity to decide whether they wish to take steps to keep all or a part of the railroad in operation. Assuming, as the Commission has, that there is no constitutional bar, such a second round of loss superimposed on the first, like Pelion on Ossa, is as unfair and inequitable as can be imagined, nor does the Commission suggest any limitation on itself. Apparently once it has decided that operation of even a segment is in the highest public interest, it may require a third and fourth round of losses to the estate so long as it can envision over the horizon a new hope that some person or group may take over and operate such a segment of the New Haven.

It is also inequitable to penalize the New Haven an additional $15,386,000 as the consequence of delaying abandonment in a hypothetical liquidation proceeding, so that the political units and representatives of the public interest could be heard, when, but for the adoption by the Trustees of a course to serve the public interest, abandonment proceedings could and would have been commenced in late 1963 and liquidation would have been started, certainly by the valuation date of December 31, 1966.

The policy of imposing an interim burden of losses, through its deficit operation, on a railroad in reorganization is to afford a reasonable opportunity to the responsible agencies to arrange the continuation of the railroad's operation, but the law does not require the furnishing of two or three or four opportunities. The duty was more than amply fulfilled by the New Haven. The public interest has had one huge bite of the apple; it is not entitled to another.

■■ This court adheres to the position that due process and just compensation provisions of the Fifth Amendment prohibit the imposition of a further period of erosion of assets on the New Haven. It has ruled that any erosion additional to that accumulated through 1968 would be constitutionally impermissible as a taking without just compensation. But in its Fourth Supplemental Report the Commission asserts that the constitutional limitation sets up no standard of value and is very flexible, so that it leaves the Commission with an almost completely unrestricted discretion so long as it declares that its decision is fair and equitable and in the public interest. The Three Judge Court and this court rejected that legal principle in their former opinions, 289 F.Supp. 418 at 440–441 and 289 F.Supp. 451 at 459; and the law as established by these courts was the law of the case which the Commission should have followed.

The Commission had argued that the contitutional right of a deficit operated railroad to cease operation and liquidate, as recognized by Supreme Court cases, had been considerably modified by later statutes.

Judge Friendly, in writing for the Three Judge Court, fully answered this as follows at p. 441:

"We cannot accept the argument that all this was changed by the addition of § 1(18), requiring the Commission's consent to abandonment, to the Interstate Commerce Act by the Transportation Act, 1920, or by the enactment of § 77 of the Bankruptcy Act in 1933. These statutes were designed to assure orderly procedures and to afford methods that might avoid the ultimate solution; they were not in-

tended to override constitutional guarantees, cf., In re Third Avenue Transit Corp., 198 F.2d 703, 707 (2 Cir. 1952), and would not be effective if they had been." [Footnote omitted.]

Now the I.C.C. argues that the leading case in support of the courts' position, Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920), and the subsequent cases relying on it, were overruled, sub silentio, by Colorado v. United States, 271 U.S. 153, 156, 168, 46 S.Ct. 452, 70 L.Ed. 878 (1926), in which, the Commission says, its "role in weighing the advantages and disadvantages of an abandonment of branch lines that lose money was preserved. * * * The Supreme Court in our view has never flatly held that a deficit-ridden railroad has an absolute right to abandon, liquidate and sell the parcels." 334 I.C.C. at pp. 55–56.

As this interpretation of the applicable law is the key to the Commission's conception of the scope of its own power, which in turn underlies most of the extraordinary and unprecedented actions taken by the Commission in formulating its Fourth Supplemental Report and Order as they affect the matter of price, it is necessary to go into an analysis and discussion of the pertinent cases.

The factual setting, for the legal principles to be expounded, is unique. New Haven's deficits were not limited to unprofitable segments of an overall profitable system. Quite the contrary. New Haven's long-time deficits were system wide. And it is this court's conclusion from an examination of the cases, that the I.C.C. is plainly in error in the legal principles which it advanced.

Brooks-Scanlon Co. v. Railroad Commission of Louisiana, *supra*, held unconstitutional the State Commission's attempt to compel a lumber company, whose overall operations were profitable, to continue the operation of a railroad which, after the exhaustion of the timber which it had originally been constructed to haul to the company's sawmills, had

no profits and no prospect of any. The Court unanimously held that the State's action deprived the company of its property in violation of the Fourteenth Amendment. Justice Holmes' opinion said, *inter alia*, "A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage * * *." 251 U.S. at 396, 40 S.Ct. at 183. He cited Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77 (1876), apparently merely for its dictum that one who devotes his property to public use and thereby subjects it to regulation "may withdraw his grant by discontinuing the use." 94 U.S. at 126.

The holding of *Brooks-Scanlon* was reaffirmed in Railroad Commission of State of Texas v. Eastern Texas R. Co., 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569, (1924). In that case the railroad, another intrastate line originally constructed to serve logging industries, operated at a deficit after the timber ran out. Nevertheless, it continued to operate until it had exhausted both cash and credit. (Unlike *Brooks-Scanlon* and like the New Haven, the line was not part of a generally profitable business enterprise.) The State attempted to enjoin abandonment (which the I.C.C. had authorized) and dismantling. Again a unanimous Supreme Court, citing *Brooks-Scanlon*, held that, in the absence of contract, a carrier could not constitutionally be compelled to operate at a loss. The Court said (264 U.S. at 85, 44 S.Ct. at 248):

"The company, although devoting its property to the use of the public, does not do so irrevocably or absolutely, but on condition that the public shall supply sufficient traffic on a reasonable rate basis to yield a fair return. And if at any time it develops with reasonable certainty that future operation must be at a loss, the company may discontinue operation and get what it can out of the property by dismantling the road. To compel it to go on at a loss *or to give up the salvage value* would be to take its property without the just compensa-

tion which is a part of due process of law" (emphasis supplied).

The Court conceded, as it had in *Brooks-Scanlon*, that if a railroad did desire to continue its operations, the State might compel it to provide adequate service to the public, even though compliance might be "attended by some pecuniary disadvantage." *Ibid.*

Where and in what way these cases were overruled sub silentio by *Colorado v. United States*, 271 U.S. 153, 46 S. Ct. 452 (1926), must be apparent only to the wishful thinking of the Commission for nothing in the holding or dicta of that case conveys any such suggestion to a reader who is trying to find it. There the I.C.C. had authorized an interstate railroad, whose operations were generally profitable, to abandon an unprofitable intrastate branch, finding that its continued operation at a deficit would impose an undue burden on interstate commerce. The State brought suit to enjoin compliance with the order. The sole issue was the respective areas of state and federal jurisdiction, specifically whether Congress could constitutionally give a federal agency power to authorize the abandonment of an intrastate branch, and the Court's holding was simply that, since the operation of the branch had an effect on the road's interstate operations, "[t]he exercise of federal power in authorizing abandonment is not an invasion of a field reserved to the state." 271 U.S. at 165, 46 S.Ct. at 455. No issue of constitutional right to abandon was presented. The State assumed the validity of *Brooks-Scanlon* and *Eastern Texas*; indeed, it relied on their dicta to support its argument that the railroad had no right to abandon a losing part of the line while continuing to enjoy the privilege of operating profitable parts within the State. The Court cited *Eastern Texas* with apparent approval. The I.C.C.'s version of the decision is probably based on a dictum that Congress had made public necessity and convenience the sole test of authority to abandon. 271 U.S. at 168, 46 S.Ct. 452. But the statement was not made in the context of a discussion of a constitutional right to abandon, and it seems in the last degree unlikely that Justice Brandeis, who wrote the opinion, intended to make a gratuitous assertion, overruling prior decisions of the Court, that a carrier could be compelled to operate at a loss for however long a time public convenience and necessity might require such operation. Ten years after the decision of the *Colorado* case the Court cited both *Brooks-Scanlon* and *Eastern Texas* for the precise proposition that "a common carrier cannot be compelled to carry on business indefinitely at a loss." [7] *Pacific Telephone & Telegraph Co. v. Tax Commission*, 297 U.S. 403, 413, 56 S.Ct. 522, 525, 80 L.Ed. 760 (1936). See also *Mora v. Mejias*, 223 F.2d 814, 818 (1 Cir. 1955). Actually Justice Brandeis' dicta in *Pacific Telephone* went further: "If, because of such loss, a corporation, seeing no prospect of betterment, wished to discontinue its local business and were prevented by law from doing so unless it discontinued also its interstate business, the law might be held void as imposing an unconstitutional condition upon the privilege of engaging in interstate commerce." 297 U.S. at 413, 56 S.Ct. at 525.

It should be noted that the question of the I.C.C.'s power to compel a car-

---

7. It now appears that the Commission's notion that *Colorado* overruled *Brooks-Scanlon*, *sub silentio*, was only a temporary aberration. In Tennessee Central Railway Co., abandonment of operations Docket #24964, 333 I.C.C. 443 decided April 25, 1968, the Commission said at 452, "It is well established that a carrier should not be required to continue in the business of carriage when its overall operations are conducted at a systemwide deficit for a substantial period of time and where there is no reasonable prospect of the applicant's conducting those operations at a profit for the foreseeable future. Compare Brooks-Scanlon Co. v. Louisiana R. Comm., 251 U.S. 396, 40 S.Ct. 183 (1920), and Chicago N. S. & M. Ry. Abandonment of Entire Operation, 317 I.C.C. 191 and 363."

rier to operate in the financial circumstances of *Brooks-Scanlon* and *Eastern Texas* (which were essentially the same as the New Haven's, which all concerned, including the Commission, agreed had no prospect of profitable operations) has never been litigated. In the somewhat similar case of the New York, Ontario and Western, the Commission did in fact authorize abandonment. See 334 I.C.C. at 59. But there is no reason to suppose that the limitation which the Fifth Amendment places on federal power to compel carriers to operate at a loss is any weaker than the restriction which the Fourteenth Amendment places upon the power of the States to do so. *Cf.* In re Third Avenue Transit Corp., 198 F.2d 703, 707 (2 Cir. 1952).

The Commission also suggested that *Brooks-Scanlon* and *Eastern Texas* somehow rested on the method of determining value for rate-making purposes which was prescribed by Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898); and that their basis was destroyed when that case was overruled by Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), which held that the F.P.C. might use any method of valuation in fixing a rate, so long as the result was "just and reasonable". The Commission attached much weight to the Court's statements that "there are no constitutional requirements more exacting than the standards of the [Federal Power] Act" and that a "rate order which conforms to the latter does not run afoul of the former." 334 I.C.C. at 57. But these statements do not, of course, suggest that Congress could provide a criterion for rate making which did not meet the Fifth Amendment's standard of "due process." The Act required the Federal Power Commission to set rates which were "just and reasonable", and the Court's assumption that a "just and reasonable" rate of return on investment is due process seems unquestionable. It may be arguable, as the I.C.C. suggested, that a deficit-ridden railroad has no absolute right to abandon, but only a right to stop the deficits (334 I.C.C. at 56), but the distinction is academic here where it would be impossible to set a rate which would yield a "just and reasonable" or "fair and equitable" return (or any return at all) upon investment. *Brooks-Scanlon* and *Eastern Texas* did not in any way depend upon the particular method employed to reach the conclusion that the operations of the carriers could not yield a fair return on investment. The *Hope* case is irrelevant to the issue in the present case with which the Commission was dealing.

This court, therefore, concludes that *Brooks-Scanlon* and subsequent cases, reaffirming the validity of its holding, are still applicable and determinative. The Commission is unable through a groundless construction of statutes, as noted above, to eliminate the constitutional guarantees applicable to this case. And it may not arrogate to itself a vast expansion of power through a strained interpretation of Supreme Court decisions.

There remains its claim that the use of the term "fair liquidation value" demands the consideration of and deduction from gross liquidation proceeds of all the burdens, delays, costs and expenditures derived from court and Commission proceedings to terminate a reorganization effort and institute an equity receivership to effect a liquidation. While in the present case the Commission referred only to the delay attendant upon leave to abandon, it is equally logical to hypothesize all of the steps which would necessarily precede actual liquidation. The Commission never entertained any such concept on the first round. If there is only one exclusive and universally recognized meaning to the term fair liquidation value and that meaning must include all steps in liquidation proceedings, it is indeed strange that the I.C.C. did not consider it in the Second and Third Supplemental Reports. Its declared reasons for not doing so are transparent pretexts un-

der the cover of which the Commission arbitrarily and capriciously confers a benefit—not on the public—but on Penn Central, which would obtain New Haven's assets at a price substantially below fair liquidation value and yet comply with the condition for the Pennsylvania-New York Central merger that it take over the New Haven.

As previously stated, the term "fair liquidation value" has been used in the present case to describe a method or theory of determining value. It envisioned sales of New Haven property over a period of six years and of economic factors related to the business process of turning the properties into cash. It was a method of getting at fair market value less the costs and expenses incidental to the selling program.

The hypothesis did not include an analysis and computation of costs, expenditures and delays in terminating the reorganization proceedings, commencing an equity receivership, and seeking abandonment and liquidation. It was limited to determining price through the historically recognized theory of fair liquidation value in a context where all elements of a sale were present and only price remained to be fixed. There was nothing in the actual facts of the case which required a hypothetical concept which included a consideration of all the legal proceedings from termination of the reorganization to completion of liquidation. Neither the hypothetical concept nor the actual case requires consideration of such legal proceedings. It was not until the Fourth Supplemental Report that the Commission hauled in by the heels the issue of the right to abandon as a condition precedent to liquidation, and used it as an arbitrary device to reduce what it found the liquidation value to be, i. e. $162.7 million, because it felt that figure was too high to be fair and equitable to Penn Central. But in the very Report and Order in which it fixed that liquidation value it ordered inclusion and payment to be made by January 1, 1969, thereby, in effect, not only approving but directing abandonment of the New Haven and liquidation of its assets.

Turning now to the additional deduction (referred to as the bulk sales discount) of $6,695,000 subtracted by the Commission from liquidation value, it is the conclusion of the Reorganization Court that this deduction is also improper and without support in law or reason. It is predicated on the fact that Penn Central is purchasing all of the New Haven's assets at one time. The Commission explains it as giving recognition to the price differential between sales at wholesale and retail. There is nothing in the record to show that such a thing as a wholesale market for all of New Haven's railroad properties exists. There is apparently no retail market either. Value, under the circumstances of this case, can only be arrived at through the dismantling of the transportation plant and a piece by piece sale of the properties. It is clear from the record that a market existed for the disposition of the properties on this basis. Their value is the best price the market place will give the seller, less the costs and expenses relevant to the sale, as more fully mentioned above. It makes no difference whether the purchaser wants to use the property as is, or to improve and develop it. The question is how much will the market place give for a particular item of property. This must be arrived at through the testimony of experienced and qualified experts, as was done in this case. The Commission and Penn Central urge that Penn Central should be credited with a bulk sales discount for removing from the debtor's estate the risk of non-sale or of sale below fair market value. But the computation in arriving at fair liquidation value has already deducted $8,000,000 for this purpose, in addition to costs and expenses attending the sale of the properties. It is true that a bulk purchase would eliminate all of these expenses and the risks of marketing the properties over a span of 6 years, but in arriving at fair liquidation value, which is a net value, all of these items

were deducted. Now the I.C.C. would give Penn Central an encore—the gift of a double deduction.

■■ Further the bulk sale deduction violates the fair upset value minimum for sales of a debtor's property, as provided in § 77(b) (5), because "fair upset value" is the lowest price the debtor's estate could accept for the properties. That lowest price is what the market would pay, which is implicit in the standard used here, i. e. fair liquidation value. Neither a trustee nor an equity receiver could, with the court's approval, sell for less.

The Commission appears to place some reliance in its brief on quoted portions of this court's opinion of August 13, 1968 to support the Commission's view that the fairness standard is the ultimate test of a constitutional price for the New Haven. This reliance is misplaced. Contrary to the Commission's statement that the Reorganization Court disavowed any fixed minimum price that the Constitution might require, this court fully concurred with the Three-Judge Court's conclusion that fair liquidation value was a mandatory constitutional minimum. On page 459 of that opinion in 289 F.Supp., this court said, " * * * the constitutional minimum of value of property rights to which the bondholders are entitled (in this case the liquidation value as of December 31, 1966) * * *." made clear what the court had in mind.

### Grand Central Terminal Properties

■ The bondholders attack the Commission's valuation of New Haven's interest in the Grand Central properties on several grounds. With all except one, this court neither finds that plain error was committed by the I.C.C. nor that its conclusions were unfair or inequitable. The claim that there is value to the New Haven's right of access to the Grand Central Terminal requires some comment in view of this court's suggestion in its August 13, 1968 opinion that the Commission consider and make findings as to what

value, if any, attached to what the court considered a valuable interest. After reading the briefs and hearing the arguments of all those who urged this point, and those opposed, the court is now satisfied that the Commission's treatment of the matter must stand. The Special Master and the Three Judge Court concluded there was no value in the interest, principally because it is not the kind of interest that would survive liquidation; nor, if it did, could it be assigned. Moreover, there was no evidence that the expenses of maintaining the terminal would be any less. And the idea that the State of New York, or an interstate authority might pay, directly or indirectly, some consideration for availing itself of that use is highly speculative in view of the bargaining positions of the states and the disposition of the I.C.C. to require Penn Central to furnish such access free of charge to a state or public authority which assumed the commuter service, as a condition of Penn Central's getting rid of that much of the losing and burdensome passenger service. While mitigation of a burden may in some circumstances furnish a consideration, it is not a measurable one for the purpose of this issue in the case.

■ The one claim made by the bondholders which points to plain error on the Commission's part relates to New Haven's claim to accrued excess income for the years 1967 and 1968. This is not a matter of valuation at all, but is an accounting matter for income received, to which the New Haven is entitled to one-half. Penn Central argues, and the Commission held, that because the value of the hotel properties was computed, on the basis of capitalization of earnings, as of December 31, 1966, all income thereafter was covered by that computation and to permit the New Haven to share in the income thereafter, would afford it a double allowance. This is manifestly wrong. Current earnings and expenditures, relating to the properties assumed to be liquidated, continued until the transfer

of the assets to the Penn Central. If Penn Central were permitted to retain this excess income for 1967–68, it could, on the same principle, claim all the rents collected by the New Haven on all its leased property and all of the freight and passenger revenues. Correlatively, fairness and equitability would require that Penn Central pay all of the losses for the same period. New Haven's 50% share of the excess income for 1967 and 1968 should be paid over or credited to it by Penn Central at the post-closing adjustment at the end of May, 1969.

*Harlem River & Oak Point Freight Yards*

In considering the claims of the parties relating to the Harlem River and Oak Point Freight Yards in connection with the inclusion report or the first round of hearings, this court decided that the I.C.C.'s acceptance of the lower of two appraisals for industrial use attributed to appraiser McCann, i. e. $18.1 million rather than $22.65 million, was supported by substantial evidence and could not be set aside as unfair or inequitable. McCann himself did not testify on the first round and, therefore, there was no cross-examination to probe the basis for his conclusions. His appraisals came in through witness Thompson, head of the New Haven's real estate department. From this it appeared that McCann's higher figure was based flatly on the assumption that the properties were fully operating railroad yards. His lower figure was based upon the assumption that, coincidental with the liquidation of the New Haven, all of the tracks would have been pulled up and removed and the properties would be left without electricity or any power—in short, non-railroad served real estate. On this state of the evidence there seemed to this court no reason to disturb the Commission's finding.

At the hearings on the second round, McCann did testify. He revealed that at the time of the appraisal made for Thompson and put into the record through the latter's testimony, he, McCann, was entirely unaware that the Port Morris branch of the Penn Central bordered or came to the edge of the Oak Point Yard. A rail connection was presumably available through a spur track connection. Actually, the lines on the property on December 31, 1966 connected with the Port Morris branch line and there was nothing to require the tearing up and removal of the tracks from the property upon liquidation of the New Haven. Nor was there any showing of a necessity to do so. Penn Central, in effect, argues that it would refuse to make an agreement for a spur track connection because of the large expense of removing certain clearance problems on its own branch (a point which was largely refuted by some of its own evidence) as well as difficulties with car classification, and because the revenues from industrial users of these yards would not warrant it. The Commission accepted this argument and made its decision on that basis. The conclusions required to be reached for such a decision were not, however, supported by substantial evidence and cannot stand. It is undisputed that the Port Morris branch was and is there and operating and Penn Central has not been authorized to abandon it. Instead of assuming that the industrial development of the 160 acres of the two yards would not make a spur track connection economically feasible, the Commission should have concluded precisely the opposite.

The tracks running through these yards are the connecting link between both the Penn Central's Port Morris branch and the Hunts Point Wholesale Market erected by the City of New York at a publicly announced cost of approximately $100 million dollars, and between that market and the New York Connecting Railroad. The great bulk of produce for feeding of the millions of residents of metropolitan New York is brought in by rail through these yards to this market and distribution point. To assume that the State and City of New York would stand idly by and permit the life line to its huge and costly

enterprise to be cut, just as it is in the midst of planning its necessary enlargement, because it was unwilling or unable effectively to bring pressures to bear or take steps on its own to preserve the connection with Penn Central is absurd, even if the I.C.C. continues its policy of forcing the railroads to handle perishable produce at a loss. Under circumstances where the City of New York may itself have acquired the line running through the yards, it is certainly unlikely that Penn Central could then deny a spur track connection to industrial owners and users of the property in question. In fact, it is probable that the business from the industries would tend to reduce the losses incurred, if any, in serving Hunts Point. It is far from clear why the Commission concluded that Penn Central would be compelled to give the State of New York, or its transportation authority, free access to the Grand Central Terminal for passenger trains operated by the State because of its economic strength, political pressures, and the requirements of the public interest, and in the next breath took the view that the City or State, or both, could not acquire a connection with Penn Central for its Hunts Point Market which is equally important to the City of New York and the public interest. As a matter of law the Commission should have adopted McCann's appraisal of these yards with rail service at $22.7 million rather than his appraisal without rail service at $18.1 million, which requires an addition to fair liquidation value of $4.6 million.

*Failure of I.C.C. to correct understatement of liquidation value by deducting $16.2 million in accrued real estate taxes*

Both this and the Three Judge Court directed the Commission to remove from its calculations of liquidation value the sum of $16.2 million of accrued real estate taxes on property to be transferred free and clear of liens. In the Fourth Supplemental Report it complied to the extent of $14.6 million,

and left $1.6 million as a part of the liquidation expenses.

The Commission's reason for this bizarre result is that the reorganization plan itself calls for the payment of these accrued taxes in notes payable over a period of time. It found that the market will discount the notes by 10% or $1.6 from their face value and, therefore, this amount should, in effect, be subtracted or remain subtracted from the fair liquidation value. But this does not follow. The Commission was directed to remove the tax obligation from all consideration of fair liquidation value because it has nothing to do with that subject, and all $16.2 million must be so removed. The $16.2 million of accrued taxes remains an obligation of the estate. How the tax, bond and other creditors deal with it has nothing whatever to do with fair liquidation value, and is of no concern to Penn Central, as purchaser.

*Valuation of the 950,116 shares of Penn Central stock*

In arriving at a valuation of the 950,116 shares of Penn Central stock transferred by Penn Central as part of the purchase price for the assets of the New Haven Railroad, the Commission, presumably in an effort to assure fairness to Penn Central, did not use the market value of December 31, 1966 or an average of the values at or about December 31, 1968, the actual date of transfer. Instead, it adopted the theory that, after all, the purpose of using stock in payment was to tap the expected future economic benefit of the Penn Central merger which would come to full fruition seven to ten years after its effective date on February 1, 1968, but would be reflected in an upward trend of the stock at the time of closing or transfer of New Haven's assets to Penn Central, then estimated to be in 1970. The expert testimony in January 1967 forecast that the stock would fluctuate between $75 and $100 per share at the closing, about three years thereafter. The Commission found this a fair basis

for valuation corroborated by its own calculations based on the 1965 income of the Pennsylvania and New York Central Railroads, adjusted by estimated merger savings. The mean of the range of prices per share of Penn Central, estimated for the time of closing, was $87.50 and this was adopted as the stock's value.

Although contested by the bondholders, both courts accepted this per share value in their 1968 opinions on the inclusion report, the bondholders renewed their attack on the second round, and the matter was again heard by the Commission, which adhered to its original decision. Again objections have been pressed in both courts. The bondholders assert that fairness and equity require that the value should have been based on the market value of December 31, 1966—the valuation date for everything else—or on the average market for a reasonable period of time before the date of closing. The average market price on December 30, 1966 (the last trading date of 1966) was 52⅜. The closing price on December 31, 1968 was 63⅜. The average of the high and low prices for November and December 1968 was 62.81. The bondholders claim it is unfair to charge the New Haven's estate with having received $83.1 million when the form in which it was received could be acquired on the open market for about $20,000,000 less.

Nevertheless, the theory of giving recognition to an intrinsic value in the shares, which will be realized when the full economic benefits of the merger have been achieved, not only assists the Penn Central by relieving it of the need to divest itself of a crippling amount of cash, which would be prejudicial to its merger program, but affords the New Haven an opportunity to participate in probable future profits.

There is an element of unfairness, however, in the fact that the New Haven has transferred assets conservatively worth what the liquidation value says they are worth. The purchase price, to the extent of $83.1 million and fully credited to the purchaser as $83.1 million paid, is not worth $83.1 on the present market. It is credited as $83.1 paid, on an assurance or assumption that the 950,-116 shares will be worth that sum and more, but when and who will make good on that assurance is not known or not stated. The ordinary purchaser of shares of stock takes it subject to his losing or gaining on the money he put into it. But the New Haven is not that kind of a purchaser; it is being compelled to take it at a substantial present loss on an assurance of future gain. But suppose the shares never go to 87½ in the whole ten years to February 1, 1978?

The nub of the unfairness and inequity is not the 87½ fixed for present calculations, but the fact that the purchaser is getting assets of sure present value while the seller is asked to gamble for its payment on the future of the Penn Central.

This consideration does not require a change in price or an amendment to the valuations tabulated by the Commission. To be fair and equitable, however, it does require a supplemental provision fulfilling the implicit promise by the purchaser to pay $83.1 million as part of the price for the assets conveyed. This may readily be done by the Reorganization Court and does not call for a remand. Therefore, the order is amended to provide in addition that if at any time the market price of Penn Central common shares reaches and maintains 87½ per share on the New York Stock Exchange for a period of five consecutive days on which the Exchange is open and doing business (not counting days on which the Exchange is closed to trading) between the date of final consummation of the plan of reorganization and February 1, 1978, then and in that event it will be conclusively presumed that Penn Central has, in transferring the shares to the New Haven, made payment of the $83.1 million of the purchase price represented by the shares. If, however, the common shares of Penn Central do not reach and maintain the price as aforesaid, then the value of the shares will be determined by

the average of the means between high and low prices of Penn Central shares on the New York Stock Exchange for the 30 business days next preceding February 1, 1978, on which the Exchange is actually operating and there are sales of Penn Central shares. Penn Central will forthwith become liable to pay in cash to the New Haven, or its successor or successors, the difference between said mean market prices of those 30 days and 87½ for each share of the block of 950,-116 shares.

The benefit of this underwriting by Penn Central of any difference between the mean market prices of the shares for those 30 days and the higher price of 87½ per share and the right to recover that difference, inure only to the New Haven and its successor or successors, and do not follow the shares into the hands of a purchaser if they are sold. The right to recover the difference is, however, not lost to the New Haven even if it sells all or a portion of the 950,116 shares, provided, of course, that the circumstances, described as giving rise to the right, occur. The Penn Central is granted an option, operative between the date of final consummation of the plan and February 1, 1978, to discharge its obligation to underwrite and pay the difference between such average market price and the higher 87½ at the end of the ten year period by paying on one or more blocks of 50,000 shares to the New Haven or its successor or successors, the difference between the mean market prices for sales of Penn Central common shares and 87½ per share as of a specific day of sales on the Exchange which shall previously have been designated by Penn Central in a written notice delivered to the New Haven at least 5 days prior to such market date.

These provisions to assure full payment of $87.50 per share are not to be construed by the New Haven or its successor or successors as a directive or limitation on its handling of the Penn Central shares which it owns, either to sell or retain them in whole or in part, and it is intended to leave those responsible for the affairs of the New Haven with the same freedom to exercise their sound judgment in the company's interest, subject to law, as they would have had in the absence of such provisions.

*Valuation of Boston and Providence CCBIs.*

The Commission was in error in placing a value of $1.5 million on the CCBIs issued by Boston and Providence Railroad Corporation which inured to the New Haven and which were acquired by Penn Central. There is no competent evidence to support such a valuation and the whole concept of requiring Penn Central to pay for them is wrong. The CCBIs represent an obligation to pay out to former shareholders of Boston & Providence 52% of the net proceeds from the sale of real estate, which Penn Central has purchased, when, as and if that real estate or portions of it are sold under certain windfall conditions. In effect, the Commission's action would cause Penn Central to pay something for the privilege of later paying itself the 48% of such net proceeds if the contingencies occurred with respect to property Penn Central had already bought and paid for.

*Discount on proceeds from liquidation of New Haven's assets*

In the inclusion report the Commission found that the proceeds from the liquidation sale would be $197.9 million and discounted it for present value by $17.6 million. In the Fourth Supplemental Report it made three valuation changes: (1) it added $2.6 million for increased value of the New Haven's interest in the Boston & Providence, (2) subtracted $6.2 million for its reductions in property values, and (3) subtracted $3 million for 1966 depreciation. It did not, however, change the amount of discount but left it at the old, inapplicable figure of $17.6 million.

The Commission will, therefore, on or before June 11, 1969 file with the Reorganization Court, with copies to all parties of record, a new formulation and computation of the discount for present value of the New Haven's liquidation

proceeds, in accordance with generally recognized accounting principles and based upon the changes made in valuation items through and including those stated in the present opinion. This may be in the form of a letter or short brief. Other parties in interest will, on or before June 18, 1969 file with the court their comments thereon and any formulations and computations of their own, in accordance with such accounting principles, in a letter or brief.

## Cost to Penn Central

 It is unnecessary for the Reorganization Court to discuss in detail the Commission's findings and conclusions regarding the cost to Penn Central of the inclusion of the New Haven. One item of cost listed by the Commission is, however, wholly untenable and that is the $14.0 million attributed to Penn Central's burden of early inclusion. Because actual inclusion took place on December 31, 1968 instead of in November of 1970, as the Second and Third Reports and Orders contemplated, the Commission created a kind of right in Penn Central not to be required to take over the New Haven until 1970. But there never was any such right. The Pennsylvania and New York Central Railroads did not have to purchase their right to merge at the price of including the New Haven if it found the price too great. But they accepted these terms and merged on February 1, 1968. The Penn Central's duty to include the New Haven arose at that time, though no specific date was fixed for performance. While the agreement between the railroads and the Trustees of the New Haven assumed it would be at the time of final confirmation of the reorganization plan, that agreement never became binding in all its provisions. The purpose of the inclusion was to continue most of the railroad services furnished by the New Haven. It was abundantly clear by the end of January 1968 that the New Haven would not be able to continue its operations into 1970. Penn Central was under an obligation to take over the transportation plant of the New Haven whenever it could be tendered free and clear of liens and the I.C.C. and the courts ordered it to do so. Under the pressure of economic necessity the orders issued and inclusion actually took place on December 31, 1968; but this imposed no additional duty on Penn Central, above and beyond the obligations it had already agreed to assume.

With regard to other issues raised or objections made, including those which concern purchase price adjustments under § 9 of the agreement between the Trustees of the New Haven and the Pennsylvania and New York Central Railroads, there is not sufficient substance or merit to them to warrant interference with the Commission's Fourth Supplemental Report and Order.

Subject to any further hearing which may hereafter be found to be necessary, this court is now of the opinion that there should be only one order issued for Steps One and Two, implicit in the Fourth Supplemental Report and Order certified to this court and now being reviewed, and that order will await the court's opinion on Step Two of the Reorganization Plan; therefore, no order will be issued at the present time except for a special order relating to the single issue of the 1967 and 1968 excess income from the Grand Central properties. As mentioned earlier, this is not a part of the purchase price but is a simple matter of accounting for income received by Penn Central and not paid over. One-half of this excess income, which is readily ascertainable, is due from Penn Central to the Trustee for the New Haven and is ordered to be set off against any sum this court may order the Trustee of the New Haven to pay Penn Central as a partial settlement in the course of approving the petition for order No. 572.