**In the Matter of the NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.**

**No. 30226.**

United States District Court, D. Connecticut.

June 11, 1971.

MEMORANDUM OF DECISION ON ISSUE OF EQUITABLE LIEN AND OTHER MATTERS PRELIMINARY TO REMAND TO INTERSTATE COMMERCE COMMISSION

ANDERSON, Circuit Judge.*

This is an unusual case, and the features which make it so stem from the basic circumstances that the New Haven Railroad, a deficit operation for several years prior to and throughout the seven years of operation in reorganization, was kept going in the public interest; that it was compelled, again in the public interest, to transfer its properties and assets to Penn Central Transportation Company (Penn Central),[1] receiving in return, at the time, only a small fraction of the true and actual value of the New Haven's properties and assets while it awaited a value determination by the Supreme Court; and that the Penn Central itself went into bankruptcy shortly before the Supreme Court's decision. Although the case is unique, the controlling principles are those of simple justice.

Penn Central filed its petition for reorganization in the Eastern District of Pennsylvania on June 21, 1970. Eight days later, on June 29, 1970 the Supreme Court decided the New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691. On July 31, 1970 the Supreme Court's judgment was filed in the New Haven reorganization court, which, on August 10, 1970, directed the Trustee of the New Haven and any other parties desiring to be heard to file written statements of position, particularly as to six designated subjects hereinafter referred to as paragraphs A, B, C, D, E and F,[2]

---

* Sitting by designation.

1. As used in this opinion the term "Penn Central" means the Penn Central Transportation Company, a railroad, which since June 21, 1970, has been in railroad reorganization in the United States District Court for the Eastern District of Pennsylvania.

Prior to October 1, 1969, the corporate name of the Debtor was Penn Central Company. The term "Penn Central Company" presently refers to a Pennsylvania corporation which holds all of the stock of the operating railroad which is the Penn Central Transportation Company. While the New Haven Trustee originally received stock of the railroad Penn Central Company at the time of the New Haven's inclusion on December 31, 1968, the stock which he presently holds is stock of the parent Penn Central Company that he received in exchange for the stock of the present Debtor, the Penn Central Transportation Company, pursuant to its plan of corporate reorganization which was approved by its stockholders and made effective on October 1, 1969.

2. Those six subjects are:

A. Whether and, if so, to what extent, this court should modify its prior orders with respect to Step II of the plan of reorganization for the New Haven heretofore approved by the Interstate Commerce Commission and this court, as a result of said opinion of the Supreme Court.

B. Whether this court should indicate to the Interstate Commerce Commission specific views or recommendations with respect to the proceedings to be conducted by the Interstate Commerce Commission in its further proceedings in the premises, and, if so, what such views or recommendations should be.

C. Whether this court may order an equitable lien on or otherwise subject the assets conveyed to the present Penn Central Transportation Company on December 31, 1968 by the then Trustees of the New Haven to a first security interest in favor of the New Haven and, if so, whether such an order should be entered and what its terms should be in conformity with said opinion of the Supreme Court.

D. Whether this court may order the trustee of the indenture securing the Divisional First Mortgage Bonds issued by the present Penn Central Transportation Company to the then Trustees of New Haven, in part consideration for the assets of the New Haven conveyed on December 31, 1968, or order the Trustees of Penn Central Transportation Company, to pay over or cause to be paid over to the Trustee of the New Haven all proceeds from the sale of mortgaged property now on deposit with such indenture trustee, all future proceeds remaining to be paid with respect to sales of mortgaged property heretofore made, and all proceeds of mortgaged property hereafter sold, leased or otherwise di-

to be considered by the court in connection with the form of order to be issued in carrying out the terms of the Supreme Court decision.

Statements of position and briefs were filed by the principal parties and the case is ready for remand by this court to the Interstate Commerce Commission (I.C. C.). Meanwhile many constructive steps have been taken and much has been accomplished in resolving the problems implicit in these subjects through negotiation by representatives of the Penn Central and New Haven estates, and through action taken by the Penn Central reorganization court, over which Judge John P. Fullam presides. Similarly in the case of the Boston and Providence Railroad Corporation (B & P), there were the additional collaboration of the representatives of the B & P estate and the necessary action by the B & P reorganization court, over which Judge Francis J. W. Ford presides. Thus as to ¶ F, the B & P reorganization has been fully consummated, and a railroad reorganization instituted in 1938 has thereby been concluded.

As to ¶ D, again through negotiation and this time with the approval of the Penn Central reorganization court and this court, the Penn Central Trustees and the New Haven Trustee divided equally some $18 million received from the sale of assets which the New Haven had conveyed to Penn Central on December 31, 1968. While the subject of future drawdowns by the New Haven estate of the proceeds from sales and leases of former New Haven property warrants

continued consideration, the matters within ¶ D may at this time be dismissed without prejudice. The subjects of paragraphs A, B, C and E remain for consideration.

## JURISDICTION

At the threshold, the Trustees of the Penn Central challenge the jurisdiction of this court to make a declaration as to the foregoing subjects and the issues they involve. This court, however, has long had jurisdiction over the person of Penn Central, both under its present and former name, as a party to this action. See 399 U.S. at 428, n. 57, 90 S.Ct. 2054. At the time of the conveyance of New Haven's assets to Penn Central on December 31, 1968 the court expressly reserved jurisdiction over subject matters relating to the payment of the price, including the form of payment. The Penn Central has appeared and actively participated in all of the proceedings before this court concerning the transfer of assets and payment for them from December 19, 1968 forward, including the period from the time when Penn Central petitioned in reorganization to the present.

■ This court has the exclusive jurisdiction to determine the effect of the Supreme Court's mandate in the *New Haven Inclusion Cases*, and this court must decide what is to be done to implement it. The full price required to be paid for the New Haven's assets was decided, but the terms of the payment were not; and this court alone must review and determine what means, pursuant to

vested by the Trustees of Penn Central Transportation Company and, if so, whether such an order should be entered and what its terms should be in conformity with said opinion of the Supreme Court.

E. Whether this court may order the Trustees of Penn Central Transportation Company to pay over to the Trustee of the New Haven, periodically as may be determined pending resolution by the Interstate Commerce Commission and judicial review of the issues remanded by the Supreme Court, of an amount equal to half the excess income from the Grand

Central Terminal properties and, if so, whether such an order should be entered and what its terms should be in conformity with said opinion of the Supreme Court.

F. Whether this court may order the Trustees of Penn Central Transportation Company and the Trustee of the New Haven to carry out as soon as possible the plan of reorganization of the Boston and Providence Railroad Corporation and, if so, whether such an order should be entered and what its terms should be in conformity with said opinion of the Supreme Court.

the Supreme Court's mandate, are proper. The I.C.C. cannot adjudicate the issues of law now before this court, for these lie outside its jurisdiction. The Commission itself has so held in principle in the Boston & Providence Railroad Reorganization Proceedings, 290 I.C.C. 363, 382 (1954), 327 I.C.C. 10, 15 (1966), and, again, in the very proceeding before this court the Commission stated:

"It is not within our jurisdiction to fix New Haven's legal rights, if any, in the Grand Central Terminal properties." Pennsylvania Railroad Company—Merger—New York Central Railroad Company, 331 I.C.C. 643, 680 (1967).

This court, with the aid of a special master appointed by it, adjudged those rights.

So here, the Commission has no jurisdiction to decide the legal questions of the New Haven's status, whether as that of a stockholder or creditor, including the type of creditor, and the further related question as to whether or not the New Haven estate has a full security interest in its former properties for the balance of the purchase price. These are legal questions which are for this court's determination in construing the Supreme Court's mandate. In the circumstances of this case ordinary sense and logic call for a resolution of these paramount issues before remand of the case to the I.C.C. in order that it may proceed with prior knowledge of how the legal questions have been adjudicated.

The Penn Central Trustees point to § 77(a) where it says the reorganization court " * * * shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located * * *," and argue that all jurisdiction is in the Penn Central reorganization court and only that court can impose or declare a lien or determine any other questions affecting the New Haven properties transferred to Penn Central on December 31, 1968. Of course, the language

of § 77(a) literally gives the New Haven reorganization court exclusive jurisdiction over all legal or equitable interests which the New Haven has in any property, even though it may be in the possession of the Penn Central. The Penn Central's Trustees' argument ignores the fact that the New Haven reorganization court not only reserved jurisdiction over the matter of payment for the assets transferred to Penn Central by the inclusion order itself, but it has a mandate from the Supreme Court to deal further with questions relating to the determination of the rights and obligations of the parties with regard to the form of payment for the property of the New Haven transferred to the Penn Central. It would be odd, indeed, if by the same decision, this court were barred, for example, from determining whether or not in the circumstances an equitable lien should be declared which would relate back to December 31, 1968, the date of the transfer, because meanwhile the transferee, over whom this court has long had jurisdiction with respect to the terms of the transfer, filed for § 77 reorganization itself in the Eastern District of Pennsylvania. It should clearly be borne in mind, however, that this court claims only the power to declare the existence of an equitable lien on the conveyed property, including a constructive trust to the extent of the capitalized value of one-half of the excess income from the Grand Central properties, for the balance due on the purchase price. With the property in the possession of the Trustees of the Penn Central and with the duties of operation resting on that company's Trustees, the New Haven reorganization court does not under present circumstances assert the power to enforce such a lien. The declaration of a lien will have no adverse impact on the ability of the Penn Central to operate as a railroad, and the Penn Central reorganization court will remain wholly in control of the effect, if any, of such a lien on the operations of the railroad and on its reorganization plan formulation.

The fact that the adjudication which the court is now making does not interfere with Penn Central operations or plan formulation distinguishes this case from Gardner v. New Jersey, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), where New Jersey was attempting to pull out chunks of the railroad from the reorganization court's jurisdiction; and from Warren v. Palmer, 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118 (1940), where the Supreme Court relied on § 77(c) (6) and the principle against interference with operations to sustain the jurisdiction of the New Haven reorganization court. Warren v. Palmer clearly illustrates that the "exclusive jurisdiction" clause cannot literally be relied on. In that case the B & P was under the "exclusive jurisdiction" of the reorganization court in Boston. The New Haven and the Old Colony Railroads were under the "exclusive jurisdiction" of the United States District Court at New Haven. The Old Colony Trustees and the New Haven Trustees rejected the B & P lease; the New Haven was ordered to operate the formerly leased lines for the account of the B & P; and the question was whether the New Haven reorganization court could adjudge a lien for operations on the B & P property. Here there were two reorganization courts, each with "exclusive jurisdiction" over the debtor and its property wherever located. Reading § 77(a) literally, the B & P reorganization court in Boston, with "exclusive jurisdiction" over the B & P, had exclusive jurisdiction over the B & P lines because the lease had been rejected and the B & P was owner. Yet the Supreme Court sustained the "exclusive jurisdiction" of the New Haven reorganization court to declare a lien on the B & P property. The Supreme Court sustained that exercise of power by reference to § 77(c) (6), which deals with the rejection of leases and operations of leased lines, and emphasized that the jurisdiction of the New Haven reorganization court was being sustained because the matter dealt with operations.

The B & P affords another illustration of how the statutory provision for "exclusive jurisdiction" accommodates to practical situations. As pointed out *supra*, three reorganization courts, each with "exclusive jurisdiction" adjudged matters within its peculiar jurisdiction to effect the consummation of the B & P reorganization.

■ The "exclusive jurisdiction" clause in § 77(a) was designed to eliminate the need for ancillary receivership proceedings; to give one court, the reorganization court, power to preserve the railroad as a unit and as a going concern, and, with the aid of the I.C.C., to approve a plan of reorganization. Accordingly, suits may be brought against the reorganization trustees on claims arising out of rail operations in any court of competent jurisdiction; and, even though the reorganization court has summary jurisdiction, it must, in an approriate situation, permit an adjudication of the matter to be made in another court. Thompson v. Magnolia Petroleum Company, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940).

■ That the "exclusive jurisdiction" clause must always be read in light of its background is further made evident in relation to accounts receivable held by a railroad in reorganization. Penn Central, for example, has millions of dollars of accounts receivable. A purely literal reading of the "exclusive jurisdiction" clause would suggest that such collection proceedings would have to be conducted before the reorganization court. However, it is elementary that the Penn Central reorganization court does not have jurisdiction, over the objection of an account debtor, of proceedings to collect these accounts receivable. In re Standard Gas & Electric Co., (Hastings v. H. M. Byllesby & Co.) 119 F.2d 658 (3 Cir. 1941); 2 Collier on Bankruptcy (14th ed.) ¶ 23.05 [4]. Plenary suits for this purpose must be brought in courts of competent jurisdiction and would not come before the reorganization court.

That language in this area of bankruptcy cannot be applied with orthological exactitude is further demonstrated by 28 U.S.C. § 1334. This section provides:

"The district courts shall have original jurisdiction, exclusive of the courts of the States, of all matters and proceedings in bankruptcy."

Yet it is accepted practice that hundreds of actions involving bankruptcy matters can and are brought in the state courts. 1 Moore's Federal Practice (2d ed.) ¶ 0.-60 [8.-6]. Indeed, at times, they must be brought in a state court. Thompson v. Magnolia Petroleum Company, *supra*.

 This court's jurisdiction is supported by other principles, such as the line of cases holding that a court which has *in personam* jurisdiction can nevertheless determine rights with respect to property in the *in rem* jurisdiction of another court, Barrett v. International Underwriters, Inc., 346 F.2d 345 (7 Cir. 1965); Dempsey v. Pink, 92 F.2d 572 (2 Cir. 1937), cert. denied 303 U.S. 648, 58 S.Ct. 745, 82 L.Ed. 1109 (1938); 1A Moore's Federal Practice (2d ed.) ¶ 0.222; and also by cases which, while recognizing that state courts have exclusive jurisdiction over probate matters, hold that the federal courts nevertheless have jurisdiction over *inter partes* suits, otherwise within federal jurisdiction, that do not usurp jurisdiction of a probate nature. 1 Moore's Federal Practice (2d ed.) ¶ 0.60 [1], p. 604.

Moreover, there are compelling practical reasons why this court should resolve the issues now before it. In addition to the Supreme Court's mandate, this court has had the advantage of a decade of dealing with the complex factual circumstances which have attended the New Haven's reorganization, with the clashing claims made by multiple contending parties and the continuing duty to protect the New Haven estate. It is the only district court that has had to hear and rule upon every aspect of the case from its beginning to the inception of the present issues. For reasons analogous to those which prompted the Supreme Court to recognize this reorganization court as having preferred jurisdiction over the three-judge court in New York to determine the price to be paid for the property transferred to Penn Central, this court has like jurisdiction to hear and decide the issues now before it.

## OUTLINE OF EVENTS LEADING TO INCLUSION CASES IN SUPREME COURT AND CONSTRUCTION OF MANDATE.

A brief résumé of the pertinent events leading up to the Supreme Court's hearing of the *New Haven Inclusion Cases* is essential to an understanding of the rationale of its decision and to a sense of what is called for in implementing it.

After the New Haven had been in reorganization and had carried on its deficit operation for seven years during which its assets had been depleted by 60 to 70 million dollars in the public interest, this court decided that it could not allow the interests of the New Haven bondholders to be further eroded after the end of 1968 because the constitutional prohibition against the taking of private property without just compensation forbade it. At the same time the court continued to be acutely aware of the crucial importance of the railroad to the economy of southern New England and the public interest in preserving its operation. Accordingly, because the Pennsylvania and New York Central Railroads had voluntarily agreed—in a contract that became irrevocable upon their merger on February 1, 1968—to include the New Haven as a condition of their merger, the Interstate Commerce Commission and this court ordered the merged Penn Central physically to take over the properties and operations of the New Haven by the end of 1968. The inclusion took place on December 31, 1968. At the time of the transfer the Penn Central paid, exclusive of the 956,-576 shares of Penn Central stock, about $63 million on account of the indebtedness ultimately found due by the Supreme Court and which, as a part of its

own merger, Penn Central had agreed to pay. Penn Central and all other parties knew on December 31, 1968 that the total value of the consideration Penn Central was to pay remained for future determination by the federal courts.

Two federal district courts had been concurrently exercising jurisdiction and were principally concerned with the issue of fair and equitable price which Penn Central should pay for the assets of the New Haven. A three-judge district court for the Southern District of New York, exercising jurisdiction under § 5 of the Interstate Commerce Act, had on July 10, 1968 enjoined the order of the I.C.C. originally fixing the price to be paid by Penn Central for the New Haven's assets at $125,000,000. This reorganization court, exercising jurisdiction under § 77 of the Bankruptcy Act, on August 13, 1968 similarly rejected that price.[3] Subsequently, the I.C.C. in its Fourth Supplemental Report fixed the purchase cost to Penn Central at $140,-600,000, plus $5 million for a share of the New Haven's operation losses in 1968, for an aggregate total of $145,600,-000. In reviewing this valuation, this reorganization court held that the I.C.C. legally erred as to six items for an undervaluation of $29,035,899.[4] Accordingly, it fixed the total cost to Penn Central at $174,635,899. The three-judge district court, on the other hand, found an undervaluation of only $990,-000. Penn Central acquiesced in this finding and paid this additional amount to New Haven.[5] The price differential between this reorganization court and the three-judge district court was in the neighborhood of $28 million.

The other side of the problem was whether the consideration which Penn Central had paid New Haven was equal to the credit given Penn Central. The real controversy swirled around the value attributable to the 956,576 shares of common stock of the Penn Central Company. This reorganization court, mindful of its duty to see that all are treated fairly, on its own initiative, formulated underwriting provisions designed to assure that the New Haven would obtain a per share value of $87.50; and, as underwritten, approved the per share value of $87.50. The three-judge court adopted the same underwriting provisions and the $87.50 figure.

As the cases reached the Supreme Court, Penn Central had been credited in round figures as follows: $33.3 million for assumption of certain obligations of New Haven, cancellation of certificates issued by the Trustees of the New Haven, and cash payments; approximately $29.6 million for the $34,025,800 principal amount of 5% Divisional First Mortgage bonds of Penn Central that liened the former New Haven rail properties; and $83.7 million, the value assigned to the common stock.

The Supreme Court (1) held that although the three-judge court initially had jurisdiction concerning the merger, it should have stayed its hand in determining the price to be paid by Penn Central and the value of the consideration Penn Central had transferred to the New Haven, since this reorganization court was the preferred court to determine those matters; (2) affirmed this court in all respects as to price; and (3) stated that at the time of this court's decision,

---

3. As the Supreme Court noted in the New Haven Inclusion Cases, the three-judge court estimated the $125 million figure was an understatement on the order of $45 million to $50 million, and the reorganization court, $33 million to $55 million. 399 U.S. at 414-415, 90 S.Ct. 2054.

4. The reorganization court held that the Commission had legally erred as to the following items (the first five increased the price, the sixth reduced it):

| $15,386,000 | one year abandonment delay |
| 6,695,000 | bulk sale discount |
| 4,439,000 | Bronx Yards |
| 1,600,000 | improper deduction for tax obligations |
| 2,415,899 | excess discount to present value |
| − 1,500,000 | CCBI's |
| $29,035,899 | |

5. It did this on November 11, 1969. The "mix" of the consideration paid was:

| $370,260 | bonds |
| 565,290 | stock |
| 54,450 | cash |
| $990,000 | |

it had correctly decided as to the value of the common stock, in the light of this court's proposed underwriting, but that because of recent events, i. e. Penn Central's bankruptcy, "The reorganization court's decree may be wholly unrealistic," as indeed it now is, and that "a reassessment of the consideration that Penn Central is to give in exchange for" the New Haven's assets is required.

The Supreme Court's decision clearly requires a realistic assessment—not a formal one, for if only the latter had been in the Court's mind, the Court would have affirmed in toto. Nothing would have remained to be done except to determine how the additional price should be paid.

It was clearly the intent of this court, the parties, and the Commission that the New Haven estate would be fully compensated. The Constitution requires as much. This court formulated the underwriting provisions for the stock with the belief that these would make the New Haven whole as to the value attributed to the stock, but Penn Central's bankruptcy has made all the provisions concerning the stock "wholly unrealistic." [6]

"The fairness and equity that are the essence of a § 77 proceeding," the Supreme Court stated, "forbid our approval of a payment for the transferred New Haven properties that may be worth only a fraction of its purported value." 399 U.S. at 488, 90 S.Ct. at 2108.

Continuing, the Court said:

" * * * In the circumstances of this case, and for the reasons we have already set out at length, we agree with the reorganization court that it would be unfair and inequitable to allow Penn Central to take the properties for any lesser sum [liquidation value]. Moreover, we today require a reassessment of the consideration that Penn Central is to give in exchange for those

properties. We thereby accord the bondholders the right to a liquidation and a per-parcel sale that is theirs by virtue of their mortgage liens. * * " 399 U.S. at 489–490, 90 S.Ct. at 2108. And " * * * we must also reject any lingering suggestion by Penn Central that the price it must pay for the New Haven assets is unfair in either a statutory or a constitutional sense. * * " 399 U.S. at 493, 90 S.Ct. at 2110.

■ Accordingly, the Supreme Court's mandate obligates the Trustees of Penn Central to see that the New Haven estate is fully compensated for the remaining balance due the New Haven in the amount of $132 million plus, with interest.

The Supreme Court, as 489, 90 S.Ct. at 2108, stated that

" * * * further proceedings before the Commission and the appropriate federal courts will be necessary to determine the form that Penn Central's consideration to New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central."

It also, at page 399, 90 S.Ct. at page 2061, noted the petition of the Penn Central for reorganization under § 77 and stated:

"Whether the financial obligations dealt with in the present opinion may become subject to modification in or because of those proceedings is a question with which the present opinion in no way deals."

■ It is this court's position that the nature and form (including whether or not it should be treated as secured) of the indebtedness of Penn Central to the New Haven for the assets transferred, long before Penn Central went into reorganization, and at a time when both the New Haven, as debtor, and Penn Central were solely under the jurisdiction of this

6. Cautiously, the Supreme Court said: "may be wholly unrealistic." 399 U.S. at 488, 90 S.Ct. 2054.
While such cautionary language was proper at a time only 8 days after Penn

Central's bankruptcy, the intervening year strips away the "may be" qualification and makes clear that the stock arrangement is "wholly unrealistic."

court, are matters within the exclusive jurisdiction of this court. Both the New Haven and Penn Central reorganization courts have the duty and jurisdiction to protect the New Haven's constitutional right not to have the equity imposed security of the transferred properties further confiscated in the public interest. The Penn Central reorganization court has exclusive jurisdiction over any action by the New Haven Trustee to enforce his equitable lien and also over the form of the consideration and its time and manner of payment as they may be affected by a fair and equitable plan of reorganization of the Penn Central.

This position is consonent with the Supreme Court's statements above quoted.

## IMPLEMENTATION OF THE SUPREME COURT'S MANDATE.

(Including discussion of ¶ C, note 2, supra)

■ In order fully to compensate the New Haven estate for the balance remaining due and to provide reasonable security for the sum owed, it is the opinion of this court that the Supreme Court's mandate must be implemented by providing: (1) that the 956,576 shares of common stock of the Penn Central Company, the parent Company, should be treated as collateral security, of indeterminate value, for the balance of the purchase price due by the Penn Central Trustees; it is wholly unrealistic to treat the stock otherwise; (2) that an equitable lien must be declared on all of the former assets transferred by the New Haven to Penn Central, exclusive of (a) rolling stock and (b) the New Haven's one-half interest in the excess income from the Grand Central properties; and (3) that the Penn Central Trustees hold the latter item of property subject to a constructive trust in favor of the New Haven estate.

The above mentioned equitable lien is not a consensual lien nor is it an involuntary equitable lien arising out of a judicial proceeding, such as that which emanates from a creditor's bill to reach and apply equitable assets which are beyond the grasp of legal process. See Freedman's Savings & Trust Co. v. Earle, 110 U.S. 710, 4 S.Ct. 226, 28 L.Ed. 301 (1884). The lien here invoked is the kind which the chancellor creates to do equity under the peculiar circumstances of the case, and, in particular, by the bankruptcy chancellor to implement a just reorganization under § 77 of the Bankrupcty Act.

The Trustee's brief sets forth a reasonably good description of this type of equitable lien as follows:

"An equitable lien has been defined as a right, not existing at law, to have specific property applied in whole or in part to the payment of a particular debt. Thus, there must be a debt or obligation and a *res* to which the debt can attach. The doctrine is a remedy *for* a debt, based upon traditional equitable theories of estoppel and unjust enrichment. An equitable lien may be imposed where one party, by a course of conduct, has raised the expectation in the other party that an obligation will be secured, or where one party takes a conveyance or assignment of the property of another and retains the property without paying for it. Morrison Flying Service v. Deming National Bank, 404 F.2d 856 (10th Cir. 1968), cert. den. 393 U.S. 1020 [89 S.Ct. 628, 21 L.Ed.2d 565] (1969); Reconstruction Finance Corp. v. Sun Lumber Company, 126 F.2d 731 (4th Cir. 1942); Westall v. Wood, 212 Mass. 540 [99 N.E. 325] (1912)."

The Tenth Circuit also stated the matter well:

"An equitable lien is a creature of equity, is based on the equitable doctrine *of unjust enrichment, and is the* right to have a fund or specific property applied to the payment of a particular debt. Such a lien may be declared by a court of equity out of general considerations of right and justice as applied to the relationship of the parties." (Footnotes omitted.) Caldwell v. Armstrong, 342 F.2d 485, 490 (10 Cir. 1965).

■ In the first place it was expected and intended by the parties that full payment would be made to the New Haven Trustees for the property, assets and rights which they conveyed to the Penn Central. The I.C.C. ordered Penn Central to pay a price less than the fair liquidation value of the property; and it was not until June 29, 1970 that the full purchase price was determined by the Supreme Court's decision. Meanwhile the Penn Central Transportation Company went into reorganization. Its Trustees now assert that the New Haven Trustee has at best no more than a general claim in bankruptcy for the balance of the purchase price. This ignores the whole history of the New Haven inclusion, the general terms and framework of which stem from the contract of April 21, 1966, made between the New Haven Trustees and the Pennsylvania and New York Central Railroads. 399 U.S. 409–413, 90 S.Ct. 2054. This contemplated a simultaneous payment of the purchase price at the time of the transfer of the New Haven's assets to the merged Penn Central. As the Supreme Court said, 399 U.S. at 410, n. 45, 90 S.Ct. at 2067:

> "The transfer was to be free and clear of all liens and encumbrances, with minor exceptions. The liens and encumbrances would shift to the proceeds of the sale and thus remain an obligation of the New Haven estate."

This concept followed through, to and including the actual transfer. Except for some high priority claims, the real parties to whom the proceeds of the sale and transfer belong are the New Haven bondholders. They had secured claims before the transfer of the assets to the Penn Central on December 31, 1968 and the parties had agreed and intended that the New Haven bondholders would have a secured claim after the transfer of assets by having a lien on the proceeds. The reason the New Haven bondholders do not in law have such security is because the Penn Central Transportation Company has not paid the full proceeds to which the bondholders' lien can shift and attach. In equity, therefore, their lien on the property, which was the subject of the transfer, did not "shift to the proceeds of the sale" but remains on the property transferred.

■ The Penn Central Trustees argue that any such claim is foreclosed by the order and deed of transfer which said the property was conveyed "free and clear of all liens, charges and encumbrances thereon." This covenant, customarily incorporated in the overwhelming majority of transfers in the ownership of the fee of real property and frequently incorporated in instruments of conveyance at bankruptcy sales, may render a transfer free of such liens as a consensual lien or a judicial lien arising out of a creditor's bill, but it does not constitute a waiver of the chancellor's equitable lien or a bar to his power to create one. If this customary clause were to constitute a waiver of the chancellor's equitable lien, the bankruptcy chancellor would be shorn of his power to protect the estate in any situation where the covenant or clause "free and clear" was used and there could be no such thing as an equitable lien in that sense. The clause cannot be used either in law or equity to insulate a grantee who has failel to pay the purchase price from having the property subject to an equitable lien in favor of the grantor. The parties were fully cognizant of the fact that the total purchase price had not been determined, that it would not be fixed for several months, but that whatever the Supreme Court said it was, the Penn Central had a duty to pay it. By the time the price had been determined Penn Central had maneuvered itself into a financial debacle and had filed a petition for reorganization under § 77.

The fact that the New Haven was compelled in the public interest to convey its properties to the Penn Central without simultaneously receiving the full purchase price did not constitute a waiver of a lien which at that time could not be determined. A party can only waive a known right and it must do so intentionally. Neither fact existed here. The right to additional payment of purchase

price on which a matured lien would depend was not then adjudicated. The New Haven had, at the time of the transfer, an inchoate lien with which the property was impressed. It could only become a matured lien through the act or default of the grantee, itself, the Penn Central. This it accomplished by failure to pay the price fixed by the Supreme Court. In the circumstances of the case, this is not the kind of lien referred to by the "free and clear of all liens * * " clause in the deed of conveyance which was intended only to cover liens and encumbrances imposed by act of the grantor or third persons and not those caused by the act of the grantee itself. The matured equitable lien relates back to the date of the transfer, which was the date the inchoate lien arose which the act of the Penn Central itself brought to fruition.

Its Trustees take the position that the New Haven Trustee and the New Haven bondholders, as beneficial owners, have no equitable claim at all; that the New Haven Trustees made an agreement of sale, got a down payment, including shares in Penn Central, which they said they wanted, and conveyed the property of the New Haven to the Penn Central. Though there is till due and unpaid on the purchase price agreed to be paid over $132,000,000, the Penn Central Trustees say the New Haven is only a common creditor, at best, except for the divisional mortgage. They argue that no security for this purchase price should be afforded the New Haven estate because the old New Haven assets might have to be expended in the public interest to pay for the Penn Central's operational losses and further, if anything were left, the New Haven property should be used to secure the Penn Central's other creditors, presumably its other bondholders. For example, Manufacturers Hanover Trust Co., Indenture Trustee under N. Y. Central & Hudson River R. R. Co. Gold Bond Mortgage of 1897, claims that the New Haven property comes within the provisions of its mortgage. The Penn Central Trustees do not contradict this.

 Thus one sees the New Haven's properties and assets, which on December 31, 1968 furnished some security for the New Haven bondholders, who had contributed substantially to their acquisition, transferred to Penn Central, which, after paying only a small fraction of the price in actual money's worth before going into reorganization, now through its Trustees contemplates using the property to make up for its own operational losses or to furnish additional security for its bondholders and other creditors. Certainly these are circumstances that cry out for equitable relief.

The Penn Central Trustees are actually seeking an unjust enrichment. These putative beneficiaries never gave any consideration for the acquisition of these properties by the New Haven and they have no equity in them which is the equivalent of or superior to that of the New Haven bondholders.

Considerable emphasis must be given to the fact that the issue of an equitable lien in favor of the New Haven estate on the property transferred to Penn Central on December 31, 1968, affects *only* the interests of the two parties, i. e. the New Haven and the Penn Central. Interests of third parties, innocent or otherwise, are not involved, because no creditor entered into a credit transaction with the Trustees of Penn Central in reliance upon Penn Central's ownership of the New Haven property unencumbered by an equitable lien.[7] While the State of Connecticut appears to make such a claim, its interest is in seeing that no equitable lien will impair the agreement between the Connecticut Transportation Authority and Penn Central Transporta-

---

7. The declaration of an equitable lien in the present case is not intended to affect, nor should it be construed to affect, former properties of the New Haven transferred to Penn Central and which were conveyed as non-operating properties by Penn Central to third persons between January 1, 1969 and the date of the filing of this memorandum of decision.

tion Company, and it is abundantly clear that the equitable lien claimed by the New Haven would not do so. As a result of the negotiated settlement between the Trustee of the New Haven and the Trustees of the Penn Central, relating to the Penn Central's acquisition of the B & P and reflected in the petition for and in this court's order Number 634, dated February 16, 1971, the declaration by this court of an equitable lien on former properties of the New Haven will not apply to the former properties of the B & P. See also Order Number 636, dated March 22, 1971.

Although the Penn Central's Trustees strongly imply the contrary, the deficit ridden New Haven Railroad was not foisted upon Penn Central; rather the Pennsylvania and N. Y. Central Railroads voluntarily agreed to purchase and operate it as a condition to their right to merge. They knew the New Haven was a deficit operation and had been for over a decade. They knew the New Haven would continue to be so, at least for some years to come. The suggestion that Penn Central's own financial difficulty was brought on "to some extent" by losses of the New Haven, coupled with the intimation that this creates a kind of equitable claim by Penn Central which off-sets a claim by the New Haven is untenable.

The condition of the New Haven Railroad was known to the world. It appears that the true condition of the Penn Central may not have been. If either party was misled to its damage in the inclusion transaction, it was not the Penn Central. It seems likely at present that the true financial condition and position of the Penn Central at the time of its acceptance of the transfer of the New Haven's properties, was not, and had not been fully disclosed to the Interstate Commerce Commission, the federal courts or the Trustees of the New Haven or its bondholders.

The Trustees of the Penn Central concede in their brief that if there had been fraud involved on the part of Penn Central in taking over the New Haven prop-

erties, there would be ground for the imposition of an equitable lien. Fraud was not alleged in the statements of position now before this court, and is not being considered as a part of the record of the case. The court, however, is aware of Congressional and I.C.C. reports and other materials which suggest that an inquiry may be needed to determine whether or not the officers and directors of Penn Central on December 31, 1968 knew, in the exercise of their duties, or reasonably ought to have known, of facts concerning their company's financial condition which were of vital concern to the New Haven's Trustees and creditors but not disclosed to them. The purpose of mentioning this is to make clear that in ruling on the present issues, this court is in no wise adjudicating any question of fraud or reckless mismanagement which is the functional equivalent of fraud. It expressly reserves jurisdiction to hear and decide such questions as may arise out of any non-disclosure of material information relating to the transfer of the New Haven's properties to Penn Central, and the promise by the latter to pay for them the price which the Supreme Court determined to be fair and equitable insofar as such questions concern the interests of the bankrupt New Haven Railroad.

It must be remembered that the early time of the transfer of properties and assets of the New Haven on December 31, 1968 in advance of a final judicial determination of the actual price to be paid and on payment by the Penn Central of only a small fraction of what that price was ultimately held to be, was not sought by any of the parties. Rather it was imposed by ruling of the I.C.C. and the order of this court. At that time it was opposed by Penn Central in an effort to compel the approval, in substance, of the I.C.C.'s findings and conclusions relative to price as a condition precedent to its taking over the New Haven; and the New Haven First Mortgage Bondholders were calling for liquidation. The Trustees of the New Haven

simply followed the directions of this court. The transfer was not effected in the interest of or for the benefit of the New Haven's creditors. It was done simply and solely in the public interest to keep the trains of the New Haven running. The New Haven Railroad faced a grave emergency. It had suffered and was continuing to suffer staggering losses so that its operations could not be continued beyond 1968. The price issue could not possibly, short of stipulation, be finally adjudicated until after 1968, and immediate inclusion in spite of no final price determination was the only solution.

There remain for discussion the assertions by the Penn Central Trustees and the I.C.C. that the public interest requires that the New Haven properties conveyed to Penn Central be held free of any lien and available to be encumbered by, or expended for losses incurred in the deficit operation of keeping the Penn Central trains going in the public interest.

The Penn Central Trustees argue as follows:

"The equities favoring the Penn Central's unencumbered ownership of the former New Haven assets, on the other hand, are over whelming. First, as the Commission and courts have recognized, 'the first policy to be served in reorganization proceedings is "continued operation of the property * *." ' Fourth Supplemental Report and Order, 334 I.C.C. 25, 61 (1968). Transfer of the New Haven Assets was designed to further this interest:

'A total abandonment of the NH would be inconsistent with the public interest * * * Operation by Penn Central, on the other hand, provides a feasible and achievable alternative. Yet, in order for Penn-Central to effectively rescue the NH operations, it must be free to conduct them according to the dictates of good and efficient management as an integrated part of its own system. *This it cannot do if it must*

*take the NH properties without the power of disposition over them and subject to the creditors' liens.'* 344 I.C.C. at 75. (Emphasis added.)

The central reason for ordering inclusion of the New Haven assets on December 31, 1968, 'free and clear of all liens and encumbrances,' was to facilitate the maintenance of the railroad as an operating entity in the public interest."

In the *New Haven Inclusion Cases,* however, the Supreme Court said:

"After 35 years of § 77, as amended, it is unnecessary to recanvass the two basic objectives of the statute—the conservation of the debtor's assets for the benefit of creditors and the preservation of an on-going railroad in the public interest." 399 U.S. at 431, 90 S.Ct. at 2078.

It is quite clear that a bankrupt railroad's estate (which is to say the owners of rail securities) must sustain the burden of losses incurred in a deficit operation for a reasonable period following the petition in bankruptcy and before abandonment to enable governmental officials and those who represent the public to take steps to preserve railroad transportation service if they are satisfied it is in the public interest to do so. In the *New Haven Inclusion Cases,* 399 U.S. at 491, 90 S.Ct. at 2109, the court said:

"The rights of the bondholders are not absolute. As we have had occasion to say before, security holders

'cannot be called upon to sacrifice their property so that a depression-proof railroad system might be created. But they invested their capital in a public utility that does owe an obligation to the public. * * * [B]y their entry into a railroad enterprise, [they] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs.' Reconstruction Finance Corp. v. Denver & R. G. W. R. Co.,

328 U.S. 495, 535–536, 66 S.Ct. 1282, 90 L.Ed. 1400."

But the public interest cannot demand the erosion of the bankrupt's assets to the point of confiscating practically the entire estate. At some point the extent and degree of taking runs into the constitutional prohibition in the Fifth Amendment the taking of private property for public use without just compensation. The time needed to afford the public a fair opportunity to take the necessary action to provide for the continuance of rail service rests in the sound discretion of the reorganization court. The estate of the New Haven Railroad lost between 60 and 70 million dollars in maintaining its deficit operation up to January 1, 1969. This court held that any further erosion of the estate of the New Haven in the public interest would be an unconstitutional taking of private property without just compensation and this was affirmed by the Supreme Court. 399 U.S. at 466, 90 S.Ct. 2054.

The Commission, however, had taken a view which appeared to arrogate to itself almost absolute authority over the extent to which a debtor railroad's estate could be consumed in compelling it to continue a deficit of operation.

In its Fourth Supplemental Report, 334 I.C.C. 25 at 55–56, the I.C.C. in discussing Railroad Commission of Texas v. Eastern Texas RR., 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569 (1924), held that " * * * if at any time it develops with reasonable certainty that future operation must be at a loss, the company may discontinue operation and get what it can out of the property by dismantling the road. To compel it to go on at a loss or to give up the salvage value would be to take its property without just compensation which is a part of due process of law."

The Commission went on to mention that the *Eastern Texas* case cited Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920), which had held that a railroad may abandon even a branch line that loses money and cited

in support of this, Munn v. Illinois, 94 U.S. 113, 126, 24 L.Ed. 77 (1876). It then stated that the *Munn* and *Scanlon* cases had been overruled *sub silentio* by Colorado v. United States, 271 U.S. 153, 166, 168, 46 S.Ct. 452, 70 L.Ed. 878 (1926), which preserved "the Commission's role in weighing the advantages and disadvantages of abandonment of branch lines." Through further discussion in the report and in its briefs and oral arguments the Commission seemed to have adopted a general doctrine that it had the power to compel the continued deficit operation, *regardless of devastating losses*, provided, it could find it was in the public interest to do so. Pursuant to this theory it decided that, despite the New Haven estate's losses of 60 to 70 million by December 31, 1968, it could withhold the right to abandon for another year and thereby saddle the New Haven with at least another $15 million in losses. The Supreme Court rejected the Commission's claims. 399 U.S. 457–467, 90 S.Ct. 2054. In spite of this the Commission now objects to the imposition of an equitable lien on the former New Haven properties to secure the payment for those very some properties, on the ground that it might interfere with the further consumption of those assets if it became necessary to dispose of them in the course of continuing Penn Central's deficit operation in the public interest.

In oral argument on its statement of position concerning the declaration of an equitable lien the Commission said:

" * * * the committee in its reply brief would apparently read that lien to mean that New Haven would be entitled to satisfaction of New Haven's claims against Penn Central in the form of a receipt of the proceeds from the sale of the former New Haven assets and Mr. Auerbach has essentially repeated that message this morning.

But those proceeds may indeed be needed for operations of Penn Central." Tr. pp. 58–59.

And this in spite of the fact that in its Fourth Supplemental Report, 344 I.C.C. 75, the Commission said:

"The NH creditors *are guaranteed* just and reasonable compensation and other terms for their interests in the NH, whenever distribution of the compensation shall occur, whether at the time of or after the properties pass to Penn Central. Since Penn Central must include the NH and must pay a price just and reasonable to all concerned, the creditors lose nothing, vis-a-vis Penn Central, by having *their liens* transferred from the NH properties to the consideration which Penn Central will eventually have to pay." (Emphasis supplied.)

But guaranteed by what?

By mid-night December 31, 1968 the public interest had extracted the last penny which it could constitutionally take from the property and assets of the bankrupt New Haven estate. The Supreme Court had so decided. It said, 399 U.S. at 466, 90 S.Ct. at 2096:

"We think the reorganization court was entirely correct in concluding that:

'The policy of imposing an interim burden of losses, through its deficit operation, on a railroad in reorganization is to afford a reasonable opportunity to the responsible agencies to arrange the continuation of the railroad's operation, but the law does not require the furnishing of two or three or four opportunities. The duty was more than amply fulfilled by the New Haven. The public interest has had one huge bite of the apple; it is not entitled to another.' 304 F.Supp. 793, at 801."

It also approved this court's finding " ' * * * that the continued erosion of the Debtor's estate from operational losses after the end of 1968 will clearly constitute a taking of the Debtor's property and consequently the interests of the bondholders, without just compensation. It is therefore constitutionally impermissible, and obviously no reorganiza-

tion plan which calls for such a taking can be approved.' 289 F.Supp. 451, at 459." 399 U.S. at 491, 90 S.Ct. at 2109.

■ The constitutionally forbidden erosion which could not be imposed directly cannot now be accomplished indirectly by preventing and withholding the declaration of an equitable lien. Such a lien is required to protect the already adjudicated constitutional rights of the New Haven estate. It must be reiterated that the conveyance of the transportation plant of the New Haven Railroad to the Penn Central in advance of the determination of the price to be paid for it, was made solely for and on behalf of the public interest, but there is a constitutional bar which prevents the public interest from extracting anything further out of the assets of the New Haven. The only other party affected is the Penn Central, and certainly it has no right in law or equity to take the valuable properties and assets of the New Haven estate for a small fraction of their fair value.

■ There are sufficient bases discussed earlier in this opinion to warrant the declaration of an equitable lien on the transferred property in favor of the New Haven estate. But even if those grounds did not exist, the present circumstances in which the Penn Central seeks to prevent the granting of any security for the $132,000,000, rightfully owed, and from the beginning agreed by the contracting parties to be a *liened* claim in favor of the New Haven bondholders and also seeks to appropriate and use the properties to cover its own deficit operations or to secure its own creditors, reenforced by the position of the I.C.C. that the former New Haven properties and assets must be left unencumbered so that they may be available for further erosion by supporting a continuing deficit operation in the public interest, all point to the absolute necessity for imposing an equitable lien on the properties and assets to protect and preserve the rights and interest declared by the Supreme Court to belong to the New Haven estate and to prevent their being dissi-

pated away by persons who are not entitled to them.

 As stated at the outset, the facts and circumstances of this case are entirely unique. The reports show no case even roughly comparable. Equity did not cease to function on the date of the last decision which imposed an equitable lien on property. If ever an equitable remedy was called for, it is here in this case. It is the only means by which the rights of the New Haven creditors can be protected. The Penn Central asserts that only two of the four States, in which the New Haven Railroad ran, recognize the doctrine of equitable lien. But that is not so. The doctrine is recognized in all four of the States,[8] and when remedial justice requires, the equity court will impose an equitable lien on personal property as well as on real estate, Porter v. Searle, 228 F.2d 748 (10 Cir. 1955); Caldwell v. Armstrong, *supra*, and it is the opinion of this court that the courts of last resort of all of the States, if they had this case before them, would hold it to be one in which the doctrine of equitable lien could be considered and applied.

 But irrespective of state law the federal interest in bankruptcy and reorganization is paramount, and where circumstances warrant, as in the case at bar, a federal court would be justified in declaring an equitable lien to accomplish a just reorganization. See Hurley v. Atchison, T. & S. F. Railway Co., 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909). This is consistent with many rulings where the bankruptcy court, applying equitable principles, did not feel constrained by state law. Thus while state laws normally determine property rights and interests, they will not be allowed to subvert the general policies of the Bankruptcy Act, and a bankruptcy court may, when necessary, determine property interests, irrespective of state law, to implement those policies.[9] For example, equitable principles governing bankruptcy distribution require the bankruptcy court to disallow a claim of interest on interest. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). And the principles of equitable subordination are not controlled by state law. Prudence Realization Corp. v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L.Ed. 1293 (1942); Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). In Prudence Realization Corp.

8. New York and Rhode Island have long recognized the doctrine of equitable liens. Birnbaum v. Rollerama, Inc., 232 N.Y.S. 2d 188 (Sup.Ct.1962); Zeiser v. Cohn, 207 N.Y. 407, 101 N.E. 184 (1913); Passarelli v. Passarelli, 94 R.I. 157, 179 A.2d 330 (1962). While Massachusetts did not recognize the doctrine prior to 1912, Ahrend v. Odiorne, 118 Mass. 261 (1875), it has given effect to equitable liens since that date. Beacon Trust Company v. Dolan, 27 F.2d 247 (1 Cir. 1928); Westall v. Wood, 212 Mass. 540, 99 N.E. 325 (1912). In Connecticut, the courts have indicated a readiness to apply equitable liens in an appropriate case. Gruss v. Miskinis, 130 Conn. 367, 34 A.2d 600 (1943); see also Hall v. Hall, 50 Conn. 104 (1882); Chapman v. Beardsley, 31 Conn. 115 (1862).
 If the lien law to be applied here were limited to that of only one of the four states, presumably it would be that of New York. See Section 29 of the Agreement, dated April 21, 1966, between The Pennsylvania Railroad Company, The New York Central Railroad Company, and the Trustees of the New Haven. And New York law unequivocally supports the equitable lien as a "recognized agency of remedial justice." Zeiser v. Cohn, supra.

9. Board of Trade of City of Chicago v. Johnson, 264 U.S. 1, 44 S.Ct. 232, 68 L.Ed. 533 (1924), held that a bankrupt's seat on the Board of Trade constituted a property interest under the Bankruptcy Act which passed to the trustee, although under state law there was no property interest reachable by creditors; Lines v. Frederick, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), held that accrued vacation pay of a bankrupt wage earner was not property which passed to his trustee because of the policy of the Bankruptcy Act in relation to wage earners.

v. Geist the Court said, 316 U.S. at 95, 62 S.Ct. at 982:

> "Nothing decided in Erie R. Co. v. Tompkins [304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] requires a court of bankruptcy to apply * * * a local rule governing the liquidation of insolvent estates. * * * The court of bankruptcy is a court of equity * * and it is for that court—not without appropriate regard for rights acquired under rules of state law—to define and apply federal law in determining the extent to which the inequitable conduct of a claimant in acquiring or asserting his claim in bankruptcy requires its subordination to other claims which, in other respects, are of the same class."

## CONSTRUCTIVE TRUST ON GRAND CENTRAL TERMINAL PROPERTIES

(Including discussion of ¶ E, note 2, supra)

All of the reasons supporting an equitable lien, discussed above, support an adjudication that the property interest in the Grand Central Terminal properties, which the New Haven transferred to Penn Central, is subject to a constructive trust in the New Haven's favor.

Originally, this reorganization court, with the aid of a special master, undertook its own resolution of the legal question as to whether the New Haven had a property interest in the terminal properties that would survive a cessation of rail operations by the New Haven, and the court concluded that the New Haven did have such an interest which should be measured by the capitalization of one-half of the excess income remaining after satisfaction of the terminal expenses. Thereafter the Commission fixed this value at $28,438,000 and both this court and the Supreme Court approved.

This court now concludes that a constructive trust in the foregoing amount should attach to all of the terminal properties as of December 31, 1968; and, additionally, as to the actual monies received by Penn Central, on or after July 1, 1971, from those properties, one-half of the excess income is impressed with a trust in favor of the New Haven estate.

Subjecting the properties to a constructive trust as of December 31, 1968 is fair to both the New Haven and Penn Central. It protects the New Haven estate's interest from being subjected to mortgage and other creditor interests of Penn Central whose equities are junior to those of the New Haven. Since the properties involved are non-operating properties, the revesting in the New Haven of its transferred title and rights does not affect Penn Central's rail operations, and the revesting protects the New Haven against conveyances of and encumbrances upon those interests without the New Haven being paid the value of its interest, which, incidentally, is roughly equivalent to the overall increase in price which this court adjudged and the Supreme Court affirmed. After stating that "fairness and equity" forbid approval of only a fractional payment of New Haven's value, the Supreme Court added: "And the same considerations of fairness and equity prevent imposing on Penn Central the burden of immediate payment in full * * *," 399 U.S. at 488, 90 S.Ct. at 2108.

In testing the order for a declaration of a constructive trust by these criteria the court has given weight to these considerations: (a) if sales or other similar dispositions of Grand Central properties are made, an appropriate liquidation of the New Haven's interest under the constructive trust is not burdensome upon Penn Central; (b) immediate payment will be required only out of income currently realized from non-rail operations, which will be relatively small in amount when compared to the total amount due by Penn Central, i. e., $132 million; (c) the date of July 1, 1971 comes a year after Penn Central went into bankruptcy and after the Supreme Court enunciated this balance of fairness approach; and (d) the payment is necessary to preserve the New Haven reorganization. The New Haven's assets consist of approxi-

mately $14 million in cash or cash equivalents, and its claim against Penn Central. Following cessation of dividend and interest payments by Penn Central, the income of the New Haven estate became essentially limited to the earnings of the cash equivalents—treasury bills, certificates of deposit, and the like. On the other hand, the estate has approximately $52 million of administrative claims which include $7 million or more of tort claims, mostly FELA cases, $12.5 million due the United States on defaulted trustees' certificates, and $17 million of real estate taxes in addition to pre-bankruptcy liened real estate taxes. Shortly after Penn Central's bankruptcy, necessity required this court, on July 6, 1970, to order the general suspension of payment of claims, although the needs of many creditors—both taxing authorities and injured persons—were great, and the appeals of the seriously injured employees and passengers on humane grounds have been very compelling. Recently, because of these considerations, the court has modified its suspension order to permit the resumption of small quarterly payments on the liquidated tort claims. Funds must be husbanded to keep the Trustee's small staff intact, and to press and safeguard the New Haven's one main asset—the amount justly due to it by the Penn Central. After balancing the equities, this court believes that equity and good conscience require that, beginning on July 1, 1971, one-half of the excess income from the Grand Central properties be impressed with a constructive trust. This does not prejudice Penn Central, for it is not entitled to operate on other people's money. Moreover, the Penn Central reorganization court has declared that the Penn Central is not insolvent.

## INTEREST

■ So that the New Haven estate is fully compensated for the balance of over $132 million due it, the estate is entitled to interest from December 31, 1968 at the appropriate legal rate, with appropriate credits given Penn Central for dividends and interest paid by it and for any payments made on principal, such as the one-half of the proceeds from the sales of former New Haven real estate in the approximate amount of $9 million.

*REMAND* (including discussion of ¶ A and ¶ B, note 2, supra.)

■ The New Haven's plan of reorganization should be remanded to the Interstate Commerce Commission subject to the legal rulings made in this opinion and also to certain legal rulings in this court's Memorandum of Decision on Distributive or Step II Portion of Fourth Supplemental Report and Order of Interstate Commerce Commission rendered on July 28, 1969, 304 F.Supp. 1121. Among other things these concern the accrual of interest and penalties on tax claims, the need to satisfy counsel fees and trustees' certificates in cash, and the provision that any claim covered by the Plan could be settled and paid in cash, subject to the approval of the reorganization court, up to the time of the consummation of the Plan. These legal rulings should stand.

Plan formulation for the New Haven is for the I.C.C. and this court. Similarly, plan formulation of Penn Central is, of course, for the I.C.C. and the Penn Central reorganization court. This court trusts that if it is at all feasible, a plan for the reorganization of the New Haven will be formulated without awaiting the reorganization of Penn Central. The two estates, however, are so intertwined that this may not be practical.

This court recapitulates its principal rulings as follows: that it has plenary jurisdiction to construe and implement the mandate of the Supreme Court; that this obligates the Penn Central Trustees to see that the New Haven estate is fully compensated for the remaining balance of $132 million; and that under the unusual circumstances of this case this court should and does declare an equitable lien in favor of the New Haven on the tangible property, exclusive of rolling stock, conveyed by it to Penn Central

and also declares a constructive trust, in the New Haven's favor, to the extent of the capitalized value of one-half of the excess income received from the Grand Central properties. It remands the plan of reorganization to the Interstate Commerce Commission to carry out and implement this court's adjudication.

*SETTLE ORDER* on or before 10:30 a. m., June 22, 1971.